In re SAN ANTONIO LAND & IRRIGATION CO., Limited.

(District Court, S. D. New York. January 6, 1916.)

1. BANKRUPTCY ☞51—VOLUNTARY PROCEEDINGS—VACATING ADJUDICATION.
    In a voluntary proceeding, in which an adjudication immediately follows the filing of a petition, good on its face, without opportunity to any interested person to question the allegations of the petition, a petition to vacate on the ground that the court obtained no jurisdiction is the correct practice, where the residence, domicile, and principal place of business of the bankrupt are not as alleged, as these matters are jurisdictional.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 49; Dec. Dig. ☞51.]

2. BANKRUPTCY ☞51—VOLUNTARY PROCEEDINGS—VACATING ADJUDICATION.
    Under Bankr. Act July 1, 1898, c. 541, § 57, 30 Stat. 560 (Comp. St. 1913, § 9641), providing for the proving of secured debts, mortgage bondholders of a corporation have standing to petition for the vacation of an adjudication on a voluntary petition on the ground that the bankrupt's principal place of business is in a different district.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 49; Dec. Dig. ☞51.]

3. BANKRUPTCY ☞51—VOLUNTARY PROCEEDINGS—VACATING ADJUDICATION.
    A receiver of a corporation appointed by a state court had an interest in opposing a voluntary proceeding in bankruptcy, entitling him to file a petition to vacate the adjudication on the ground that the bankrupt's principal place of business was in a different district.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 49; Dec. Dig. ☞51.]

4. BANKRUPTCY ☞16 — PERSONS SUBJECT TO JURISDICTION — "PRINCIPAL PLACE OF BUSINESS."
    The location of a corporation's principal place of business, within the meaning of the Bankruptcy Act, is determined purely by the facts, and not by the intention of the corporate authorities or the recitals in the charter.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 20; Dec. Dig. ☞16.
    For other definitions, see Words and Phrases, First and Second Series, Principal Place of Business.]

5. BANKRUPTCY ☞16—PERSONS SUBJECT TO JURISDICTION—PLACE OF BUSINESS.
    On a petition to vacate an adjudication in bankruptcy against a Canadian corporation organized to carry on the business of a land and irrigation company, evidence held to show that, while the corporation had attempted to do business in such a form as to avoid doing business in Texas, and though its business there was carried on through the medium of subsidiary corporations and passive trustees, its principal place of business was in fact in San Antonio, Tex.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 20; Dec. Dig. ☞16.]

6. BANKRUPTCY ☞16—PERSONS SUBJECT TO JURISDICTION—"PROPERTY WITHIN THE DISTRICT"—"BANKRUPTCY PROCEEDING."
    Within the provision of the Bankruptcy Act giving jurisdiction to the court within whose district the alleged bankrupt has property, if it does not have its principal place of business, reside, or have its domicile within the United States, corporate stock and bond certificates pledged to a pledgee within a district, and the balance in an account with a trust

company therein, was "property within the district," as a "bankruptcy proceeding" is a kind of equitable attachment, which reaches whatever assets can be reached by any available judicial process, and the situs of property is not to be determined by general doctrines, such as "mobilia sequuntur personam."

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 20; Dec. Dig. ☞16.

For other definitions, see Words and Phrases, First and Second Series, Bankruptcy Proceedings.]

7. BANKRUPTCY ☞16—PERSONS SUBJECT TO JURISDICTION—PROPERTY WITHIN THE DISTRICT.

A deposit by a corporation to meet unpaid coupons on its bonds was not property belonging to the bankrupt within the district where it was deposited that would give jurisdiction of a bankruptcy proceeding, as the deposit was a trust deposit belonging to the holders of the coupons.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 20; Dec. Dig. ☞16.]

In Bankruptcy. In the matter of the San Antonio Land & Irrigation Company, Limited, bankrupt. On review of a master's report. Report modified and confirmed, and adjudication set aside.

Guggenheimer, Untermyer & Marshall, of New York City (Louis Marshall, of New York City, of counsel), for trustee in bankruptcy.

Gordon Auchincloss, of New York City, and F. C. Davis and Terrell, Walthall & Terrell, all of San Antonio, Tex., for receiver.

Gordon Auchincloss, of New York City, and Coke & Coke, of Dallas, Tex. (Alex. S. Coke, of Dallas, Tex., of counsel), for mortgage bondholders.

AUGUSTUS N. HAND, District Judge. The San Antonio Land & Irrigation Company, Limited, a Canadian Corporation, was adjudicated a bankrupt in this district on the ground that it did not have its principal place of business, reside, or have its domicile within the United States, but had property within the borough of Manhattan in the Southern district of New York. Prior to the filing of the petition in bankruptcy, a creditors' bill was filed in the courts of the state of Texas by certain mortgage bondholders, alleging the insolvency of the company, praying for a receiver, and impounding the assets of the corporation within that jurisdiction. The receiver appointed by that court and the creditors appearing in that litigation have petitioned this court to vacate the order of adjudication because the bankrupt did not have its principal place of business, residence, or domicile within this district, but had its principal place of business within the state of Texas. The court referred to John J. Townsend, Esq., as special master, the questions (1) whether the bankrupt had its principal place of business within this district; and (2) whether, if the bankrupt had no principal place of business within the United States it had property within this district. He reported that the bankrupt (1) had its principal place of business in Texas, and not in Canada or New York; and (2) it had certain property within this district. Upon the review of the master's report, counsel for the trustee makes two pre-

liminary objections: First, that the adjudication cannot be attacked collaterally, but only upon appeal; second, that the moving parties have no standing to institute the proceeding.

[1] In a voluntary proceeding, which this was, an adjudication in bankruptcy immediately follows the filing of a petition good on its face, without opportunity to any interested person to question the allegations of the petitioner. It seems to be entirely settled that allegations as to residence, domicile, and principal place of business are jurisdictional matters. A petition to vacate upon the ground that the court obtained no jurisdiction of the subject-matter, if these facts are not as alleged, is the correct practice. In re Garneau, 127 Fed. 677, 62 C. C. A. 403; In re Guanacevi Tunnel Co., 201 Fed. 317, 119 C. C. A. 554.

[2] The bondholders have an interest which gives them a proper standing. They have provable claims under section 57 of the Bankruptcy Act, which provides for the proving of secured debts. In re Sampter, 170 Fed. 938, 96 C. C. A. 98; United States Trust Co. v. Gordon, 216 Fed. 929, 133 C. C. A. 117.

[3] An adjudication in bankruptcy would vest the equitable title to the real estate in Texas in the trustee when appointed, unless the right of the state court receiver should prove to be superior. The latter, therefore, has an interest in attacking the bankruptcy proceeding, though it is difficult for me to reconcile some of the decisions in bankruptcy with the general rule that, to give a receiver standing in this court, an original bill must be filed and his appointment obtained in this jurisdiction. A receiver in equity, however, has been allowed to appear in bankruptcy and maintain his rights in the cases of In re Hudson River Electric Power Co. (D. C.) 173 Fed. 934 (which was affirmed by the Circuit Court of Appeals of this circuit 183 Fed. 701, 106 C. C. A. 139, 33 L. R. A. [N. S.] 454); In re Gold Run Mining & Tunnel Co. (D. C.) 200 Fed. 162; and Blackstone v. Everybody's Store, 207 Fed. 752, 125 C. C. A. 290. Upon the authority of these cases, I am of the opinion that the Texas receiver is a proper party to the proceeding.

[4] Having disposed of these preliminary objections to the proceeding, the main question must be considered as to where the principal place of business of the corporation was situated during six months prior to the filing of the petition. This, under the decisions, is determined purely by the facts, and not by intentions of the corporate authorities or recitals in the charter, which, in this case, stated "the chief place of business" was Toronto. Dressel v. North State Lumber Co. (D. C.) 107 Fed. 255; Tiffany v. La Plume Condensed Milk Co. (D. C.) 141 Fed. 444; Home Powder Co. v. Geis, 204 Fed. 568, 123 C. C. A. 94; In re Tennessee Const. Co. (D. C.) 207 Fed. 203.

[5] I can have no doubt that the officers and directors desired in this case to avoid doing business in Texas, and took various steps in an attempt to prevent their acts from having such a legal effect. They incorporated the Medina Valley Irrigation Company to build a dam for irrigation and own the dam site, and the Medina Townsite Company to purchase and sell town sites. If these companies, of

which the alleged bankrupt owned the stock, had been its only agencies of operation in the state of Texas, it would perhaps rightly be regarded as a mere holding company, coming within the doctrine laid down in Peterson v. Chicago, Rock Island & Pacific Ry. Co., 205 U. S. 364, 27 Sup. Ct. 513, 51 L. Ed. 841, and similar cases. It is perfectly true that, in the absence of fraud or violation of statutory prohibitions, the law will, as a rule, regard corporations as separate entities in every substantial sense, however intimately connected by stock control or common directors. Here, however, both according to the charter provisions of the bankrupt, the prospectus and interim report to the security holders, many letters and statements of its representatives, and the important fact that its bonds were the financial source of supply for all the work in Texas, the bankrupt was in fact in actual control of the business there. The Medina Companies were its creatures and agents. Under these circumstances, under the doctrine laid down in the case of In re Muncie Pulp Co., 139 Fed. 546, 71 C. C. A. 530, it would seem to be reasonable to treat the business activities of the Medina Companies as those of the San Antonio Land & Irrigation Company, which directed their activities and held all of their stock. Palfrey was their common superintendent, and Dr. Pearson, the president of the Land Company, was the promoter and final director of the entire enterprise.

It is not necessary to regard the subsidiary corporations as nonexistent, or to disregard them in any way which would affect their separate creditors; but it is reasonable, I think, to treat them as agencies of the San Antonio Land & Irrigation Company, Limited. What impresses me most is the further circumstance that the three trustees, who held the lands and sold them for the San Antonio Land & Irrigation Company, Limited, were in reality and even in the most technical aspect mere passive trustees. They had no duties to perform, except to hold the title to the immense tract of land which was to be irrigated by the Medina Valley Irrigation Company, whose stock the San Antonio Company owned. Such a relation was no trust. There were no acts to be performed by the trustees, and no obligations, except to account for the proceeds of sales. Under the laws of most of our states, such a trust would execute itself, and the legal title would ipso facto vest in the beneficiary. No clearer case of a mere alter ego of the bankrupt, devised in the hope of avoiding the Texas law, can be imagined. The San Antonio Land & Irrigation Company, Limited, was authorized by its charter:

"To acquire by purchase or otherwise and hold lands, timber limits or licenses, water lots, water falls, water privileges or concessions and powers and rights and interests therein, and to build upon, develop, irrigate, cultivate, farm, settle, and otherwise improve and utilize the same, and to lease, sell, or otherwise deal with or dispose of the same, and generally to carry on the business of a land and land improvement and irrigation company."

In a letter written by Mr. Trueb, the secretary of the company, and included in the minutes, this company was said to have been—

"formed for the purpose of acquiring sixty thousand acres of land in the San Antonio District of Texas, and for irrigating and selling the same to settlers." Toronto Exhibit 2, p. 2.

In the interim report, Dr. F. S. Pearson, the company's president and the promoter of the whole enterprise, says this company—

"was created for the purpose of acquiring large areas of land in the vicinity of San Antonio, Tex., and developing an extensive irrigation system in connection therewith, with a view to reselling the lands with contracts to irrigate the same."

A corporation known as the Pacific Securities Company contracted to sell to the San Antonio Land & Irrigation Company, Limited, "approximately 60,000 acres of land" situated in Texas, the entire capital stock of the Medina Irrigation Company, and $1,600,000 bonds of the latter company, and was to receive in return $8,000,000 stock of the San Antonio Company and £1,200,000 bonds of the latter. The title to this large acreage was never in form in either the Pacific Securities Company or the San Antonio Land & Irrigation Company, Limited, but was purchased in the name of Cresson and was placed in the names of trustees, whose only duty was to hold it. This declaration of trust is of sufficient importance to quote:

"Whereas, the purchase money for all those tracts of land aggregating, approximately, 60,000 acres, located in the counties of Medina, Bexar, Atascosa, Frio, and Bandera in the said state of Texas, acquired and to be acquired in the names of William Aubrey, Franz C. Groos, and Leroy W. Baldwin, as trustees, has been and will be provided and paid by the Pacific Securities Company, Limited, of the Dominion of Canada, for the San Antonio Land & Irrigation Company, Limited, of said Dominion:

"Now, therefore, know all men by these presents that, at the request of said Pacific Securities Company, Limited, and said San Antonio Land & Irrigation Company, Limited, we, the said William Aubrey, Franz C. Groos, and Leroy W. Baldwin, as such trustees, do hereby declare that we stand and will hereafter stand seised of said lands, so acquired and to be acquired, in trust—

"First. For account of the Empire Trust Company of New York as trustee under the indenture of mortgage dated May 1, 1911, between said Land Company and said Trust Company, to secure an issue of said Land Company of one million six hundred thousand (1,600,000) pounds of its first mortgage bonds, and secured in trust for said San Antonio Land & Irrigation Company, Limited. That the said William Aubrey, Franz C. Groos, and Leroy W. Baldwin hereby covenant with said Pacific Securities Company, San Antonio Land & Irrigation Company, Limited, and said Empire Trust Company, and each of them, that we will hold and dispose of said lands as said indenture of mortgage directs, and, subject to said mortgage, as said San Antonio Land & Irrigation Company, Limited, may direct."

This transfer of the lands to these trustees was by virtue of a resolution of the San Antonio Company, directed to the Pacific Company, requesting such transfer. By a further resolution, H. I. Miller, vice president of the San Antonio Land & Irrigation Company, Limited (who lived in New York) was authorized to contract on behalf of that company for the sale of lands, and the trustees were "instructed to accept the directions and instructions of the said H. I. Miller." Page 53 of Minutes.

It is argued that the Pacific Securities Company, by a sale of the bonds of the San Antonio Land & Irrigation Company, Limited, which were transferred to the Pacific Securities Company in consideration for various securities belonging to that company and for the lands, was really the company that furnished the finances for the enterprise.

This is in a sense true; but the funds were procured from sales of the mortgage bonds of the San Antonio Land & Irrigation Company, Limited, and the latter company through its trustees owned the lands and sold a portion of them. The development and sale of these lands was the nature of its business and its ultimate corporate object. The Pacific Securities Company was a mere conduit for the issue and sale of securities. The purchase, development, and sale of lands was the essential business of the San Antonio Land & Irrigation Company, Limited, and that business, which was its only real business, was carried on in San Antonio, Tex. The title deeds and abstracts and all the detailed accounts were at San Antonio. The Pacific Securities Company, after the real business began, was a mere holding company. I cannot, under the circumstances, regard as determinative of the issue the fact that the book entries, the name of the corporation on the door, and other formal appearance in Texas, were so arranged as not to disclose the presence of the San Antonio Land & Irrigation Company, Limited, in that state, because the appearance was not the reality. The lands were purchased from the proceeds of the bonds of the San Antonio Land & Irrigation Company, Limited, and as a final result it owned those lands, subject to the bond issue above mentioned. The cost of the dam and its site, and also the cost of maintenance, were also furnished from the proceeds of these bonds. The Medina Valley Irrigation Company was wholly controlled by the San Antonio Land & Irrigation Company, Limited, through stock ownership.

It appears from the foregoing that the Pacific Securities Company was a holding company of the San Antonio Land & Irrigation Company, Limited; that the latter was an operating company, at least as regards the 60,000 acres, and a holding company of the Medina Valley Irrigation Company and the Medina Town Sites Company. The San Antonio Land & Irrigation Company, Limited, held its directors' and stockholders' meetings in Canada, but its essential operations were principally in San Antonio. There was its great property vested formally in trustees, but in all essential respects belonging to it and operated under its direction. Even though the Medina Companies be regarded as separate entities, and not mere corporate agencies, I think the legal mechanism of these trustees and the fact that accounts in Texas were in the names of the Medina Companies or the trustees does not outweigh the substantial essential fact that the San Antonio Land & Irrigation Company, at least in equity, and probably at law, owned the great acreage and absolutely directed the action of the trustees, whose only duty was to follow instructions and account. Mere forms and conduct of corporate meetings in Canada, and charter provisions as to where the principal place of business was situated, must yield to the foregoing facts, which clearly indicate that San Antonio was the principal place of business.

However careful the bankrupt may have been to avoid doing business in Texas, the attempt to secure such a result, in my opinion, was abortive. The belief that legal relations may be sufficiently established by mere technicalities is common enough, but is not often really true. Here the attempt to avoid doing business in Texas was based

upon form, but ignored substance. I am convinced that Texas was the place where all the business, except that of the most formal kind, was done, and that the principal place of business was San Antonio. This conclusion establishes that the adjudication in bankruptcy in this district was without warrant and must be set aside. I therefore overrule the exceptions to the master's report and hold that the principal place of business of the San Antonio Land & Irrigation Company was San Antonio.

[6, 7] In view of this, it is not necessary to consider whether there was property of the San Antonio Company within the Southern District of New York. For the purpose of making a record that may be available in case of an appeal, however, I will say that I think the meaning of the word "property" under the Bankruptcy Act should be much the same as that under judicial decisions relating to matters of taxation and attachment. In other words, a bankruptcy proceeding is a kind of equitable attachment, which should be held to reach whatever assets any available judicial process *can* reach. Consequently the situs of property is not to be determined by general doctrines, such as "mobilia sequuntur personam," which may well be applicable in matters like the law of inheritance, but by power of efficient control. Such a view is advantageous, in order to protect creditors and safeguard the taxing power. It is the real basis of the New York case of Simpson v. Jersey City Contracting Co., 165 N. Y. 193, 58 N. E. 896, 55 L. R. A. 796, where the New York Court of Appeals held that stock of a nonresident in a foreign corporation, when pledged in New York, could be attached. I shall follow this case, and hold that the stock of the Medina Companies, belonging to the bankrupt and pledged to the Empire Trust Company, was property of the bankrupt within this district. The interim bond certificates of the Medina Valley Irrigation Company were pledged in the same way to the Empire Trust Company, and subject to this pledge the equity was properly regarded as property within this state. In the same way the balance of $8.06 in the account of the bankrupt with the Empire Trust Company was property within the district. The deposit to meet unpaid coupons was, however, a trust deposit belonging to the holders of the coupons, and not property within the district belonging to the bankrupt.

For the foregoing reasons, I modify the referee's report, so as to include the stock of the Medina Companies hypothecated to the Empire Trust Company and the $8.06 account as property of the bankrupt within the district, and, as so modified, confirm the report in all respects.