**In re AEROVIAS NACIONALES DE COLOMBIA S.A. AVIANCA and Avianca, Inc., Debtors.**

Nos. 03–11678(ALG), 03–11679(ALG).

United States Bankruptcy Court, S.D. New York.

Dec. 23, 2003.

Smith, Gambrell & Russell, LLP, Atlanta, GA, By Ronald E. Barab, Leigh Jones, for Debtors.

Greenberg Traurig, LLP, New York City, By Richard S. Miller, James P.S. Leshaw, for the Official Committee of Unsecured Creditors.

Shaw, Licitra, Bohner, Esernio, Schwartz & Pfluger, P.C., Garden City, NY, By John H. Hall, Jr., for United Aerospace Corp. Inc.

Winston & Strawn, New York City, By Steven M. Schwartz, for Debis Finance Ireland and Debis AirFinance B.V.

Buchanan Ingersoll P.C., New York City, By Susan P. Persichilli, Vincenzo Paparo, for Dresdner Kleinwort Wasserstein Limited.

Sandler & Sandler, Miami, FL, By Martin L. Sandler, for EADS Sogerma Barfield, Inc.

Law Offices of Lionel Barnet, P.A., Miami, FL, By Lionel Barnet, for Med–Air, Inc. and Med–Craft, Inc.

## MEMORANDUM OF DECISION

ALLAN L. GROPPER, Bankruptcy Judge.

On March 21, 2003, Aerovias Nacionales de Colombia S.A. Avianca ("Avianca"), the leading airline of the Republic of Colombia, filed for Chapter 11 relief in this Court. Its wholly-owned subsidiary and agent in the United States, Avianca, Inc. ("Avianca, Inc."), a corporation organized under the laws of the State of New York, filed a separate petition under Chapter 11. Before the Court are motions to dismiss both Chapter 11 cases on the ground that this Court should not hear a case involving an enterprise that has not filed a case in its "home court" and whose business is arguably centered abroad, with foreign creditors outnumbering its domestic creditors at least in number. For the reasons set forth below, the motions are denied.

### FACTS

#### General Background

Avianca is a publicly traded corporation organized under the laws of Colombia, providing passenger and cargo service internationally and within Colombia. Its administrative offices are located in Bogotá, Colombia; it also has offices in the United States. At the time of the petition Avianca flew from two hubs located in Bogotá to two cities in the United States (Miami and New York), as well as to 14 locations in Colombia and 12 locations in other countries, mostly in Central and South America. At the time of its Chapter 11 filing, Avianca leased its entire fleet of 31 aircraft and 16 spare engines from lessors located or doing business in the United States.[1]

1. Avianca leased its fleet from the following lessors: Pacific Aircorp 24835, Inc.; Pacific Aircorp 24618, Inc.; PALS I, Inc.; Pacific Aircorp 23227, Inc.; C.I.T. Leasing Corp.; AeroUSA, Inc.; SWR 767, Inc.; Ansett Worldwide Aviation, U.S.A.; AWMS III (an

Avianca employs 4,153 employees in Colombia, 28 in the United States, and 148 outside of Colombia and the United States, and it also contracts with third-party providers for the services of an additional 900 employees. It derives more than 50 percent of its revenues from the Colombian domestic market; approximately 24 percent of its international air service is between Colombia and the United States.

Avianca, Inc. has its principal place of business in Miami, Florida and acts for Avianca in the United States pursuant to a general agency agreement. The agreement provides for Avianca, Inc. to market and sell tickets for air travel, to lease facilities for Avianca's operations in the United States, to procure supplies, to collect accounts, to purchase parts, and to perform other services necessary to operate an international commercial airline in the United States.

### Corporate History and Debt Structure

Avianca describes itself as the oldest operating airline in the Western Hemisphere. In late 1999, it confronted financial and operational difficulties and in response implemented cost-cutting measures. Its problems continued, and in September 2000 it negotiated interim accommodations with its aircraft lessors and lenders. By the beginning of 2001, Avianca had entered into formal restructurings with its principal lessors and lenders, with the exception of the holders of notes issued by the Bank of New York ("BONY") under a Master Trust Agreement. These notes, in the original principal amount of $75,000,000, were issued under various agreements (principally governed by New York law) pursuant to which Avianca sold to the Trust all of its right, title and interest in its U.S. credit card receivables. Collections of the "purchased receivables" are paid into an account controlled by BONY, which then distributes the proceeds: (i) to the Noteholders in satisfaction of principal and interest due on the Notes; (ii) to a reserve account; (iii) to pay any additional amounts due to Noteholders; and (iv) to Avianca.

As a result of continuing poor results, in 2002 Avianca entered into an "integration" agreement with Aerolineas Centrales de Colombia, SA Aces ("Aces"), another Colombian commercial airline. The integration was effected, in part, by the transfer of 98% of the outstanding shares of capital stock of Avianca, and of an equal percentage of the outstanding shares of capital stock of Aces, to two business trusts, in exchange for interests in the trusts. A second part of the integration was the implementation of operational agreements, including a code share agreement and plane and route swapping agreements, by and among Aces, Avianca and Sociedad Aeronautica de Medellin Consolidad S.A. ("SAM"), a Colombian domestic airline and subsidiary of Avianca. Through the alliance among Aces, Avianca and SAM, known as "Alianza Summa," the airlines have also integrated various administrative and management functions, thereby attempting to reduce costs and increase efficiency.[2]

Ansett affiliate); Wilmington Trust Company (under a Trust Agreement with Ansett); Debis AirFinance B.V.; Pergola Limited; International Lease Finance Corp.; G.E. Capital Aviation Services; Airplanes III Limited; and Airplanes Holdings Limited. G.E. Capital Aviation Services is the Debtors' largest lessor with 13 planes; Debis leases 11 aircraft to the Debtors.

2. Due to its own financial decline, Aces had, prior to final submission of the instant motions, curtailed its operations and transferred a number of routes to Avianca. Since the motions were submitted, it ceased operations and filed for liquidation in Colombia.

From 2000 to 2002, Avianca's majority shareholder, Valores Bavaria S.A. ("Valores"), made capital contributions and other equity investments in Avianca totaling $259,268,000, of which approximately $140,000,000 has been placed in a form of trust in Colombia for satisfaction of pension obligations to certain employees and former employees. Avianca has a total of 7,809 shareholders and has issued 641,706,230,539 shares of common stock and 101,746,321,334 shares of preferential stock.

Avianca's principal secured creditors are its employees, whose debt consists of pension obligations approximating $98,229,000, secured by the above-mentioned trust. In addition, Avianca characterizes as secured the claims of the Noteholders in the amount of $20,727,000.[3] Avianca's remaining creditors, in addition to the aircraft lessors, are generally unsecured, are located in several countries around the world, and provided a variety of services and goods, including fuel supply, catering services, mechanical repairs, general sales services, and airplane parts. At the time of the hearing on the motions to dismiss, the Debtors claimed that their potential debt to their aircraft lessors (located primarily in the U.S.) was $290,000,000; that they owed an additional $15,000,000 to creditors in the United States other than the Noteholders ($9,500,000 of which was apparently an obligation of Avianca, Inc.); that they owed $115,000,000 to creditors located in Colombia (a very large part of which comprises pension and tax obligations); and that they owed $12,000,000 to creditors located outside both Colombia and the United States. There is some uncertainty as to the exact amounts, but there is no dispute that substantial debt is held by creditors in both the United States and Colombia, although it is probable that Colombian creditors hold more fixed debt and U.S. creditors would hold more debt if the aircraft leases were rejected and damages were payable under the agreements.

### Proceedings in the Chapter 11 Case

At the outset of the cases the Debtors also sought and obtained approval of several "first-day orders." As in other large

3. On the day of the filing Avianca commenced an adversary proceeding against BONY. By then, Avianca had paid down its debt under the financing to roughly $20,5 million of the $75 million original principal amount. Due to Avianca's violation of a financial covenant in the fall of 2000, the Noteholders had exercised their right to direct BONY to suspend all payments of the collected amounts to Avianca and to pay these over to, or hold them for the benefit of, the Noteholders. Characterizing the agreements as a "security arrangement" and all receivables as property of the estate, and arguing that BONY had no interest in any credit card receivables created after the commencement of the case, the Debtors sought an injunction requiring BONY to turn over all future collections, as well as amounts then held in escrow. After hearing from the parties on March 21, 2003, the Court entered a temporary restraining order requiring BONY to escrow all of the receivables pending a hearing on a motion for a preliminary injunction. Thereafter, the Debtors and BONY were able to negotiate a stipulation providing for: (i) the continuation of the temporary restraining order; (ii) a standstill between the parties; (iii) the transfer by BONY to the Noteholders of approximately $214,000 from the Purchased Receivables in BONY's possession as of the petition date for application to prepetition interest; (iv) the retention by BONY of $500,000 of the funds in its possession; (v) the transfer to the Debtors of 90% of the balance remaining after the aforementioned transfers; (vi) the retention of the remaining 10% by BONY; and (vii) a 90/10 split of future receivables in favor of BONY. (See, e.g., Stipulation and Order dated 5/8/2003, Adv. Pro. No. 03–2204.) Additional Stipulations have been executed by the parties from time to time, maintaining the standstill and the 90/10 split. The parties have since submitted the dispute to a mediator in a joint effort to reach an out-of-court resolution. (See Stipulation and Order dated 9/18/2003, Adv. Proc. No. 03–2204.)

chapter 11 cases involving international airlines, the Debtors sought authority to honor prepetition tickets, to honor arrangements with the International Air Transport Association and to comply with similar obligations that, the Court was informed, constitute an airline's lifeblood. Since the extraterritorial reach of the automatic stay of § 362 of the Bankruptcy Code is uncertain, the Debtors also sought authority to pay foreign creditors who might otherwise be able to take action against Avianca in a non-U.S. jurisdiction. Similar orders have been entered in other international airline and shipping bankruptcies, including *In re Pan Am Corp., et al.,* Index Nos. 91 B 10080–87(CB) (Bankr. S.D.N.Y. Jan. 8, 1991) (orders granted); and *In re Vessel Charters, Inc.,* Index No. 190–15899–260 (E.D.N.Y. Jan 10, 1991); see also Tr. 48–49.[4] Significantly, the Debtors sought authority in their first day motions to pay the prepetition claims only of those vendors and service providers located outside of the United States *and* Colombia.[5] As of the date the instant motions were submitted the Court had approved payments to creditors of up to $35.7 million, but it appears that the Debtors actually expended much less.

Notwithstanding that the Debtors generally treated U.S. and Colombian credi- tors identically at the outset of the case, the Debtors filed several motions requesting authority to make payments to creditors in Colombia. These motions include: (i) a motion to authorize payments to creditors asserting nominal claims;[6] (ii) a motion to authorize payment of prepetition obligations over time to the Colombian national taxing authority;[7] and (iii) a motion approving a settlement with Caja de Auxilios y Prestaciones de la Aviadores Civiles ("CAXDAC"), a private-sector welfare institution that manages the pension fund for civilian aviators.[8] In these cases the Creditors Committee reviewed and in some instances negotiated changes to the Debtors' proposals; the Committee ultimately consented to all of the motions and none was opposed by any creditor.

Early in the cases, the Debtors received debtor in possession financing of up to $18,500,000 from Valores, from one of Valores' subsidiaries, Inversiones Fenicia S.A., and from Federacion Nacional de Cafeteros (collectively, the "DIP Lenders"). These Colombian entities are also the majority shareholders of the two trusts that own most of the shares of Avianca. In addition, Valores holds a prepetition unsecured claim against the Debtors in the

---

4. References to "Tr. ___" are to the transcript of the hearing on the motions to dismiss held on May 8, 2003.

5. See Motion to Authorize Payment of Prepetition Obligations to Ticketholders, etc. (Doc. # 7); Motion to Authorize Payment or Honoring Prepetition Obligations to Foreign Vendors, Service Providers and Governments (Doc. # 8); Wages Motion (Doc. # 10); and Motion Authorizing Payment of Prepetition Claims to Outside Mechanics and Repairmen (Doc. # 11). These Motions were consolidated under the Omnibus Interim order Authorizing Payment or Honoring of Prepetition Obligations (Doc. # 129). There was one exception regarding payment for landing rights in local Colombian airports.

6. Doc. # 229. The Debtors sought authority to pay small creditors, most of whom were located in Colombia but some of whom were in the United States. The Court, without objection from any party and after a thorough review by the Creditors Committee, approved payments to all creditors located in all jurisdictions whose claims aggregated less than $7,000 each. The total amount paid to these creditors was approximately $1,200,000.

7. Doc. # 231.

8. Doc. # 241.

amount of $10,078,000 and is the obligor on the promissory note being held in trust in satisfaction of Avianca's and SAM's pension obligations to their respective non-flight crew employees and former employees. The Debtors have recently drawn against their DIP loan.

On March 28, 2003, the United States Trustee appointed a seven-member Official Committee of Unsecured Creditors (the "Committee"), whose members include the largest Colombian creditors, CAXDAC (the pension fund), the pilots' union and the Banco de Bogotà Other key members are Pegasus and Debis, aircraft lessors, and United Aerospace Corp. Inc. ("United Aerospace"), a vendor of aircraft mechanical parts and the one remaining proponent of the motions before the Court.

## MOTIONS TO DISMISS

On April 11, 2003, Pegasus Aviation, Inc. filed an Emergency Motion to Dismiss the Debtors' Chapter 11 cases, and a few days later Ansett Worldwide filed a similar motion. These initial movants were aircraft lessors that had each leased five aircraft to Avianca, with Pegasus also being the lessor of one spare engine. United Aerospace filed a separate pleading joining in the motions. Several small vendor creditors located in the United States, Soundair, Inc., Med–Air, Inc. and Med–Craft, Inc., Associated Sales International and EADS Sogerma Barfield, Inc., filed brief statements, identical to one another, in support.

In response to the two lessors' motions to dismiss, Avianca filed a motion seeking court approval of an order to reject their leases and return their aircraft. The mo-

tions to dismiss went forward, however, and a hearing was held at which testimony was taken from the Debtors' chief financial officer and from Colombian attorneys for the Debtors and for the movants. Then, after the motions had been fully briefed and argued but before a decision, the Debtors reached settlements with Pegasus and Ansett and the lessors withdrew their motions. These settlements incorporated a comprehensive restructuring of the relevant aircraft leases, with renegotiated terms and rental payments, and both were approved without objection pursuant to Bankruptcy Code § 363 and Bankruptcy Rule 9019.[9]

After the withdrawal of the motions by the original movants, the Debtors gave notice to the creditors who had joined in the motions to show cause as to why the pending motions to dismiss should not be marked settled or denied. The only party that responded was United Aerospace, which filed a Statement in Further Support of the Motions to Dismiss. Although the Debtors asserted at the time that United Aerospace was a creditor only of Avianca, Inc. and did not have standing to move to dismiss the Avianca case, they have not pursued this argument. The motions therefore require a decision.

United Aerospace has adopted the substance of both motions as previously filed, the main thrust of which is that the Debtors engaged in forum shopping and chose to file their petitions in the Southern District of New York to the prejudice of their U.S. creditors. The movants[10] seek dismissal under § 305(a) of the Bankruptcy Code, arguing that it would not be in the

---

9. During these proceedings the Debtors have also restructured their leases with several other leasing companies, and these agreements have also been approved under § 363 of the Code.

10. The smaller creditors identified above have not formally withdrawn their joinders to the motions to dismiss, and they are accordingly considered to be movants herein.

"best interests" of the Debtors or their creditors to allow this case to proceed, and that Avianca should be compelled to file in Colombia. The movants argue that Avianca's choice of forum creates delay and uncertainty for all creditors (but especially for those in the United States), demonstrates bad faith, and allows depletion of the airline's assets by its foreign creditors, who may either receive voluntary payments from the Debtors in satisfaction of prepetition debts, or, being beyond this Court's effective jurisdiction, can ultimately collect upon their outstanding debts free of the restraint of U.S. law. The movants further argue, citing § 1112(b) of the Bankruptcy Code, that the Debtors will never be able to confirm an effective plan of reorganization when a majority of their creditors are not subject to this Court's effective jurisdiction and there is no parallel proceeding in Colombia. The relief proposed by the movants is that Avianca's case be dismissed and that it be directed to seek protection under Colombia's reorganization law, Law 550 of 1999 ("Law 550"). As for Avianca, Inc., the movants admit that it is a New York corporation doing business principally or exclusively in the United States, but they assume, without much discussion, that its filing is wholly dependent on, and cannot effectively continue without, a parallel U.S. filing by its parent.

Several parties in interest as well as the Debtors filed opposition to the motions, including the Official Committee of Unsecured Creditors, Debis AirFinance B.V. ("Debis"), the Debtors' second largest aircraft lessor, and Dresdner Kleinwort Wasserstein Limited, the holder of a note issued by Avianca, dated June 27, 2001, in the amount of $16,217,428. All of the opposing parties argue that while a Law 550 proceeding may be available in Colombia, the law would not provide effective relief in this case. It is pointed out that the Debtors' largest creditors are subject to jurisdiction in the United States, not in Colombia, and would not likely agree to submit to a Colombian proceeding, thus making an effective restructuring there unlikely. It is averred that economy and efficiency dictate that the case remain in this Court and that a Colombian proceeding can be opened if necessary but should not be a condition to the maintenance of this plenary Chapter 11 case.

## DISCUSSION

### Section 109(a)

■ We start, as we must, with the provisions of the statute. See *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). Section 109(a) of the Bankruptcy Code permits a Chapter 11 filing by a person (defined in § 101(41) as including a corporation) "that resides or has a domicile, a place of business, or property in the United States, or a municipality...." Cases that have construed the "property" requirement with respect to foreign corporations and individuals have found the eligibility requirement satisfied by even a minimal amount of property located in the United States. In *In re Global Ocean Carriers Ltd.*, 251 B.R. 31 (Bankr.D.Del.2000), a shipping company headquartered in Greece and 15 of its subsidiaries filed petitions in Delaware. Overruling a motion to dismiss brought by a small creditor and a group of minority shareholders, the court held that a few thousand dollars in a bank account and the unearned portions of retainers provided to local counsel constituted property sufficient to form a predicate for a filing in the United States. See also *Maxwell Communication Corp. plc v. Societe Generale plc*

*(In re Maxwell Communication Corp.)*, 186 B.R. 807, 818–19 (S.D.N.Y.1995), *aff'd*, 93 F.3d 1036 (2d Cir.1996); *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597 (Bankr.S.D.N.Y.1988), *aff'd*, 115 B.R. 442 (S.D.N.Y.1990), *appeal dismissed*, 924 F.2d 31 (2d Cir.1991); *Bank of America, N.T. & S.A. v. World of English, N.V.*, 23 B.R. 1015, 1019–23 (N.D.Ga.1982)(bank account); *In re Iglesias*, 226 B.R. 721, 722–23 (Bankr.S.D.Fla.1998)($500 in a bank account sufficient predicate with respect to a citizen of Argentina); see also 2 L. King, *Collier on Bankruptcy*, ¶ 109.02[3] (15th ed. rev.2003), stating without qualification, "there is virtually no formal barrier to a foreign entity commencing a case under title 11 in the United States." Under the eligibility test set forth in § 109(b) of the Code, there is no question that Avianca, which has substantial property in the United States, is eligible to file a Chapter 11 petition. As for Avianca, Inc., which is located in the United States and incorporated under New York law, its eligibility under § 109 is not subject to dispute.

 Notwithstanding the very broad eligibility standards set forth in § 109 of the Bankruptcy Code, a court has ample authority to dismiss a case that is not properly brought in this country. One source of such power is § 305(a) of the Bankruptcy Code, which provides that a court may dismiss or suspend all proceedings in a case, at any time, if

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension; or

(2) (A) there is pending a foreign proceeding; and

(B) the factors specified in section 304(c) of this title warrant such dismissal or suspension.

Movants rely on § 305(a) and make two related arguments. First, citing § 305(a)(1), movants contend that the interests of creditors and the Debtors would be better served by dismissal or suspension of this case. With respect to § 305(a)(2), they recognize that a foreign proceeding involving Avianca is not pending as required by the terms of that subsection, but they argue that in order to carry out the statute's purpose, the court should in effect impose an obligation on a foreign debtor to file in its "home" jurisdiction and then consider whether a plenary filing here is appropriate.

### Section 305(a)(1)

 Movants' argument based on § 305(a)(1) can be easily dealt with. Section 305(a)(1) grants the Court very broad authority to dismiss or suspend proceedings in a case if "the interests of creditors and the debtor would be better served by such dismissal or suspension." The test under § 305(a)(1), however, is whether "both the 'creditors and the debtor' would be 'better served' by a dismissal." *Eastman v. Eastman (In re Eastman)*, 188 B.R. 621, 624–25 (9th Cir. BAP 1995).[11] Courts have stressed that dismissal or suspension under § 305(a) is a form of "extraordinary relief." See *In re RCM Global Long Term Capital Appreciation Fund*,

---

**11.** The legislative history of § 305(a)(1) indicates that Congress had in mind a debtor undertaking a voluntary out-of-court restructuring and an involuntary case then being "commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests of the case." See H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 325 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6281; see also S.Rep. No. 95–989, 95th Cong., 2d Sess. 35 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5822. But the statute is not limited by its terms to involuntary cases. See *In re Colonial Ford, Inc.*, 24 B.R. 1014, 1020 (Bankr. D.Utah 1982).

*Ltd.*, 200 B.R. 514, 524 (Bankr.S.D.N.Y. 1996). Here, Avianca demonstrated that it would not be "better served" by dismissal of this case and, presumably, the filing of a proceeding under Law 550. First, there was no showing that Avianca could have obtained jurisdiction over its lessors and other major financial creditors in Colombia. The Colombian counterpart of Chapter 11, Law 550, is only four years old and relatively untested, particularly in large cases. It has no provision that permits a debtor to reject a burdensome lease, and the undisputed evidence at the hearing on the motion was that a lessor can apply to terminate the reorganization, repossess its property, and force the debtor into liquidation, if the debtor does not cure defaults within 90 days from the filing. Avianca's witness testified that it was in default of most leases at the time of the filing, that it could not at that time assume payments to all lessors and that it needed to renegotiate the leases to a market rate or reject the agreements. (Tr. 103–104) Avianca's reorganization might have been over long ago if it had no effective means of gaining jurisdiction over its lessors and either rejecting or renegotiating its burdensome leases.

It also appears, on the record of these cases to date, that the great bulk of Avianca's creditors have been well served by the proceedings. Avianca has been able to maintain its routes and continue its business, and it has entered into agreements with major suppliers, taxing authorities, employee representatives and other entities in Colombia and the United States; in each case the agreements have been approved by the Court after substantial Creditors Committee participation. Several of the lessors of its aircraft agreed to restructure their leases without any litigation. Two of the lessors who were the initial proponents of motions to dismiss also agreed to a restructuring and with-

drew their motions. One stated reason for the filing was Avianca's need for a determination of its dispute with the Bank of New York with respect to the U.S. credit card receivables. BONY has never suggested that it would prefer to have this dispute decided by the Colombian courts, and it is presently mediating the dispute under the procedures of this Court.

The airline has admittedly made concessions to its foreign creditors. As discussed above, it obtained orders early in the case to pay creditors outside of both Colombia and the United States. It sought permission to pay creditors whose claims were below $7,000, a motion based on the fact that smaller Colombian creditors were not familiar with U.S. law, and it also brought on motions to approve payments to several critical Colombian creditors, including governmental and airline supervisory authorities. Each of these motions, however, was duly noticed and unopposed, and each of the motions has precedent in other Chapter 11 cases. See *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr.S.D.N.Y.1989)(Eastern Airlines); *Michigan Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279 (S.D.N.Y. 1987); see also, this Court's General Order 203, § VI, *In the Matter of the Adoption of Prepackaged Chapter 11 Case Guidelines* (Bankr.S.D.N.Y. February 24, 1999); Baird, The Elements of Bankruptcy 222–225 (Foundation Press 1993). Contrary to the movants' prediction, Colombian creditors have not flouted the Chapter 11 process. There was unopposed testimony at the hearing that only one Colombian creditor has sought to execute on Avianca's property there, a judgment creditor for $400,000 who has special enforcement rights under Colombian law. Obviously, as further discussed below, the success of any Chapter 11 cannot be assured, but

there is evidence on the record of the instant motions that Avianca's creditors in Colombia and the United States have been "well served" by the filing of this case.

There is accordingly no basis to dismiss or suspend proceedings in these cases under § 305(a)(1).

### Section 305(a)(2)

■ Movants also rely on § 305(a)(2), which permits a court to dismiss or suspend all proceedings in a case if a foreign proceeding is pending and the factors set forth in § 304(c) of the Code warrant such action.[12] Movants cite several cases that have used § 305(a)(2) to dismiss filings or suspend further proceedings in cases brought in the United States by foreign debtors. They rely in particular on *In re Spanish Cay Co., Ltd.*, 161 B.R. 715 (Bankr.S.D.Fla.1993), where the foreign bankruptcy case had not yet been commenced at the time of the motion under § 305(a)(2). That case involved property in the Bahamas on which a bank, the only significant creditor, had a lien; the owners of the property had brought an involuntary Chapter 11 case in Florida against the debtor solely to avoid foreclosure. The court found that the bank was entitled to relief from the automatic stay to commence a foreclosure in the Bahamas and that, with that predicate, there was no reason to postpone a decision on the § 305(a)(2) abstention motion. It went on to find that, once foreclosure and, in effect,

liquidation had been commenced in the Bahamas, dismissal of the U.S. case would clearly be indicated because the Bahamas had the greatest interest in liquidating the assets of its domestic business entity, the law of the situs of the property should control in a real estate case, and there was no question that Bahamian law was entitled to recognition under § 305(a)(2)(B), incorporating the factors set forth in § 304(c) of the Bankruptcy Code.

Other cases that have dismissed U.S. cases under § 305(a)(2) in favor of foreign cases include *In re Ionica PLC*, 241 B.R. 829 (Bankr.S.D.N.Y.1999); *In re Xacur*, 219 B.R. 956 (Bankr.S.D.Tex.1998); and *In re Cenargo Int'l, PLC*, 294 B.R. 571 (Bankr.S.D.N.Y.2003). In each of these cases, the existence of a foreign proceeding (as required by § 305(a)(2)(A)) and the fact that the foreign proceeding was entitled to recognition under § 305(a)(2)(B) were important factors. But each of these cases, like *In re Spanish Cay*, also involved facts that called into serious question the propriety of any proceeding in the United States. *In re Ionica* was a plenary U.S. proceeding brought by an English debtor in an English liquidation where the *only* purpose was to access U.S. principles of equitable subordination that did not exist under English law. *In re Xacur* involved an involuntary bankruptcy proceeding brought by three Mexican banks which held notes issued in Mexico against a Mexican citizen who owned property in the

---

12. Section 304(c) provides that:

In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 304(c) (2003).

United States. The court found it did not have jurisdiction over the Mexican debtor, as opposed to a small piece of his property; that a Mexican case had been brought by these same creditors; that it would be unfair to the debtor to open separate proceedings in the United States; that separate proceedings would provide ineffective relief to the petitioning creditors; and that the Mexican courts would not necessarily recognize the American proceedings. In *In re Cenargo Int'l* an English shipping company filed under Chapter 11 in the United States in part to counter a likely involuntary filing by U.S. noteholders. But the debtor was later placed into administration proceedings in England, which was the place of its main business and the only jurisdiction with effective control over its business and assets, and *all* parties other than the U.S. creditors committee eventually agreed that an English proceeding would be the most efficient and effective way to reorganize the affairs of the company. The court accordingly overruled the one remaining objection, of the creditors committee, and suspended proceedings under § 305(a)(2). 294 B.R. at 592–93.

The facts here bear no resemblance to those of the cited cases. Most important, in view of the language of § 305(a)(2)(A), there is no foreign proceeding pending. Moreover, it would be unwarranted to impose an obligation on Avianca to file a proceeding in its "home" court, or to assume that if such a proceeding were filed it would justify suspension or dismissal of the U.S. case. The following factors, not present in the cases relied on by the movants, support Avianca's maintenance of a

plenary case in the United States and denial of the motions to the extent they are based on § 305(a)(2).

First is the level of contacts between Avianca and the United States. Some of Avianca's assets are in the United States, including aircraft that it flies to the United States daily and a substantial subsidiary doing business here. It has substantial U.S. credit card receivables and an ongoing dispute with the U.S. trustee for the U.S. Noteholders who claim an assignment of the receivables. But the real assets of an airline are its contract rights, including the leases under which it obtains the use of aircraft, the rights to use airport facilities, interline agreements, agreements with clearing houses and travel agents, and the like. For Avianca, most of these rights are centered in the United States, particularly the leases; as discussed above, Avianca has leased all of its aircraft from companies that are either located in the United States or from the United States offices of leasing companies headquartered in Europe. It has been said that the efficacy of a bankruptcy depends on a court's ability to control and marshal the debtor's assets. See *In re Rimsat, Ltd.*, 98 F.3d 956, 961–62 (7th Cir.1996). In the instant case, where Avianca's contract rights are intangibles and its most important assets (its leased aircraft) are mobile, control over its lessors may be said to be the equivalent of control over the assets.

■ The presence of property in a jurisdiction has been the traditional predicate for a bankruptcy filing, as reflected in § 109 of the Bankruptcy Code, which is derived from the Bankruptcy Act of 1898.[13]

---

**13.** Section 2a(1) of the Act, 11 U.S.C. § 11 (repealed), allowed a filing under the Bankruptcy Act by persons "who do not have their principal place of business, reside or have their domicile within the United States, but have property within their jurisdictions...."

See *Matter of Neidecker*, 82 F.2d 263, 264 (2d Cir.1936); *In re Berthoud*, 231 F. 529, 534 (S.D.N.Y.1916). Prior to 1962, § 2a(1) contained a further subsection providing that persons could file "who have been adjudged bankrupts by courts of competent jurisdiction

The requirement for the presence of property in a jurisdiction reflects the jurisprudence of a time when there was little cooperation in international insolvencies, when each nation in which a multinational enterprise did business took control of the local assets, and bankruptcy jurisdiction itself was viewed as "a kind of equitable attachment, which should be held to reach whatever assets any available judicial process can reach." *In re San Antonio Land & Irrigation Co.*, 228 F. 984 (S.D.N.Y.1916); see also *Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 192, 22 S.Ct. 857, 46 L.Ed. 1113 (1902); *Matter of Neidecker*, 82 F.2d 263, 265 (2d Cir.1936). Those principles also prevailed at a time when most insolvencies were liquidations. Today, especially in a reorganization, the presence of creditors in a jurisdiction, the power of a court to exert judicial power over them, and the willingness of other creditors to submit to the jurisdiction of the court, is often a more important factor than the presence of assets, provided that the § 109 standards are met. See *In re Enron Corp.*, 274 B.R. 327, 347–48 (Bankr. S.D.N.Y.2002). Reorganization is also largely a consensual process. See *In re Curlew Valley Assocs.*, 14 B.R. 506, 511 (Bankr.D.Utah 1981); see also, H.R. Rep. 95–595, 95th Cong., 1st Sess. 224 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6183–6184. It often depends on the willingness of a debtor's principal creditors to agree to a reorganization plan (and protect a minority by giving them more than they would get in a liquidation). The fact that many of Avianca's principal creditors are in this country, and the willingness of major Colombian parties in interest to participate in the proceedings, is one of the most significant factors supporting the filing here.

█ The further question is whether jurisdiction can fairly be exercised over nonconsenting creditors by a plenary proceeding in the United States. On these motions, the claims of unfairness were not supported. This is not a case where the foreign debtor has manipulated its place of filing or has attempted to evade its creditors, either to take advantage of the fact that the United States leaves management in possession of the estate, to benefit from a different system of priorities or to gain some other perceived legal advantage. See LoPucki, *Cooperation in International Bankruptcies: A Post–Universalist Approach*, 84 Cornell L.Rev. 696, 713–20 (1999). A bankruptcy court has ample power to dismiss such a case at an early stage whether or not a foreign proceeding is pending. See *In re Head*, 223 B.R. 648 (Bankr.W.D.N.Y.1998), where the court dismissed as filed in bad faith petitions by debtors residing in Canada, where there was virtually no nexus to the United States and the debtors were attempting to avoid contractual liability to a London creditor.

Nor is this a case where the application of U.S. bankruptcy principles will cause unfair prejudice to individual creditors. The initial movants, who were leasing companies, argued that their leases would have been priced differently had they known that they might be delayed in seizing their collateral by a U.S. Chapter 11 case. But the only testimony adduced on that point was that the lessor was surprised by the filing of a U.S. case. (Tr. 179–180) [14] Unit-

---

without the United States, and have property within their jurisdictions." See *Matter of Neidecker*, 82 F.2d at 264.

**14.** The aircraft lessor movants also contended that in a case involving a U.S. airline that is a

certificated carrier, the lessors would have special rights and protections under § 1110 of the Bankruptcy Code. Those provisions, however, govern some but not all United States airlines.

ed Aerospace, the principal remaining movant, also argued that it was prejudiced by being unable to grab assets when Colombian creditors were not so restrained. But there has been no wholesale seizure of Avianca's property by its Colombian creditors. One of the most important purposes of bankruptcy is to prevent creditors from taking unjustified unilateral action that would deplete the estate to the detriment of other creditors. See *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 503, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *SEC v. Brennan*, 230 F.3d 65, 79 (2d Cir.2000). United Aerospace cannot claim much equity in its position by arguing that it should be allowed to seize assets without interference.

There is also relatively little equity to the contention of creditors located in the United States that they are unfairly prejudiced by the application of U.S. bankruptcy principles. See *In re Rimsat*, 98 F.3d at 961; *In re Axona Int'l Credit and Commerce Ltd.*, 88 B.R. at 612. This is especially true because U.S. bankruptcy law protects a creditor's property rights; for example, a U.S. filing imposes only a temporary suspension of a lessor's right to seize its property and does not result in the creditor's claim being subordinated or eliminated. Thus, the U.S. lessor movants were free to exercise their rights under the Bankruptcy Code to require that their interests in the aircraft be protected.[15] As for United Aerospace, it has complained that the interests of the creditors of Avianca, Inc. have been effectively subordinated to the interests of the creditors of Avianca; however, if the rights of the subsidiary's creditors are being undermined, United Aerospace has less drastic remedies than the only relief it has sought, summary dismissal of both cases.

A complaint by a Colombian creditor that it was unfairly treated by the application of U.S. bankruptcy principles might have raised different equities and different issues, but there has been no such claim made in this case. Indeed, as discussed above, the Debtors' principal Colombian creditors have participated fully in the Chapter 11 proceedings. Consent is often a critical factor in determining the proper scope of a bankruptcy court's jurisdiction. See *Hong Kong and Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 997 (9th Cir.1998); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 770 (Bankr.S.D.N.Y.1996). Avianca has been able to obtain not only an effective standstill from its Colombian creditors without a formal filing, but the major creditors have actively participated in and supported these cases.

### Section 304

■ Movants also argue that the availability of relief under § 304 of the Bankruptcy Code implies a duty on the part of a foreign debtor to file in its home country and to avoid a plenary filing here. Since the enactment of the Bankruptcy Code in 1978, debtors in a foreign proceeding have had, as an alternative to a plenary filing here, the ability to seek more limited relief in a United States proceeding that is ancillary to a foreign case. Section 304 provides a "flexible" remedy that is, in many circumstances, less expensive and cumber-

15. One of the lessor movants in fact exercised its rights under the Bankruptcy Code and moved, in addition to dismissal of the cases, for an order granting it relief from the stay on the ground that Avianca did not adequately protect its interest in the property. Relief is available to a lessor under the Bankruptcy Code under § 365(d)(10) if the debtor does not perform under the lease after 60 days, and under § 363(e) and § 362(d) if the debtor fails to provide adequate protection. In the instant case, the Court found that the lessor was adequately protected and denied the motion.

some than the opening of a plenary proceeding here. See *In re Culmer*, 25 B.R. 621 (Bankr.S.D.N.Y.1982).[16] Section 304 is founded on the concept that there is one "main proceeding," presumably opened in the country of the principal place of business or "center of main interests" of a multinational enterprise, and subordinate ancillary proceedings that are commenced for more limited purposes in other jurisdictions. See *In re Treco* 240 F.3d at 153–54; also *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 348 (2d Cir.1992). It represents an effort to rationalize the administration of the insolvency of multinational enterprises.[17]

As beneficial as § 304 may be, there is nothing in the Bankruptcy Code to suggest that foreign entities cannot open a full proceeding or that a § 304 ancillary case is a preferred alternative for a foreign enterprise. See Samuel L. Bufford, *et al.*, International Insolvency 28 (Federal Judicial Center 2001). Section 303(b)(4) of the Code expressly permits a foreign representative to commence an involuntary plenary proceeding if necessary in order to take control of the United States assets of the foreign estate. See *In re Axona Int'l Credit & Commerce, Ltd.*, 88 B.R. at 606.

There are also a handful of cases, including *In re Axona*, where the courts have considered whether to open a full U.S. proceeding or to sustain a § 304 case brought by a foreign representative. In *In re Axona*, the foreign representative brought a plenary proceeding and, when it had served its purposes, successfully dismissed it in favor of a less expensive and burdensome § 304 proceeding, over the strong objection of a U.S. creditor. In *In re Gee*, 53 B.R. 891 (Bankr.S.D.N.Y.1985), the court sustained the § 304 petition and dismissed the Chapter 11 filing; in *Interpool, Ltd. v. Certain Freights of the M/V Venture Star*, 102 B.R. 373 (D.N.J.1988), *appeal dismissed*, 878 F.2d 111 (3d Cir.1989), the court sustained an involuntary Chapter 7 case and dismissed the § 304 petition. None of these cases has implied that § 304 is a preferred remedy. See also, *In re Bird*, 222 B.R. 229, 234 (Bankr.S.D.N.Y. 1998); Westbrook, *Multinational Enterprises in General Default: Chapter 15, the Ali Principles, and the EU Insolvency Regulation*, 76 Am. Bankr.L.J. 1, 10–12 (2002). Indeed, as in *In re Axona*, the most obvious principle at work was a thorough pragmatism as to what relief would best suit the needs of the foreign debtor.

16. Under § 304 a "foreign representative" appointed in a "foreign proceeding" petitions the Court for more limited relief than the commencement of a full bankruptcy case, such as an order restraining creditors from interfering with property in the United States involved in the foreign proceeding, or an order to remit property of the foreign estate to the foreign court for administration there. In order to be entitled to relief under § 304, the foreign representative must be able to satisfy the factors set forth in § 304(c). See *Bank of New York v. Treco (In re Treco)*, 240 F.3d 148 (2d Cir.2001).

17. This model has become the template for the UNCITRAL Model Law on Cross–Border Insolvency, U.N. Sales No. E. 99V.3, which

has been recommended for adoption by member states and has to date been adopted by several nations. The UNCITRAL Model Law has also, with certain revisions, been proposed for adoption as Chapter 15 of the Bankruptcy Code. See H.R. Rep. 5472, 107th Congress, 2d Session (introduced Sept. 26, 2002). It uses the term "foreign main proceeding" to mean a foreign proceeding taking place in the country where the debtor has the "center of its main interests." The opening of a "main" and "non-main" proceeding is also the model for the European Union Convention on Insolvency Proceedings, November 23, 1995, 35 I.L.M. 1223 (1996), Official Journal of European Communities 160 (2000), which became effective in 2002.

**16**

Moreover, movants' contention that Avianca would be "better served" by the commencement of a proceeding under Law 550 in the Republic of Colombia and the filing of a § 304 petition in this country does not withstand analysis. The fact that Colombian law does not provide an effective mechanism for rejecting leases is discussed above. If Avianca had filed in Colombia and had then commenced a § 304 ancillary proceeding here, it would have had to overcome the argument that our courts, in a § 304 ancillary proceeding, should not enforce substantive rights that go beyond those available in the home court. *Cf. Metzeler v. Bouchard Transp. Co. (In re Metzeler)*, 78 B.R. 674, 679–80 (Bankr.S.D.N.Y.1987); *Petition of Gross*, 278 B.R. 557 (Bankr.M.D.Fla.2002). In any event, there would have been extensive litigation over the issue whether Law 550 meets each of the criteria spelled out in section 304(c) in order to be entitled to recognition here. The § 304(c) factors include the "distribution of proceeds of such estate substantially in accordance with the order prescribed by [the Bankruptcy Code]." 11 U.S.C. § 304(c)(4). Avianca showed, for example, that Law 550 elevates the rights of pension, tax and other priority creditors over those of secured creditors, and that for that reason alone Law 550 might be subject to dispute under *In re Treco*, 240 F.3d at 159–60.[18] It is likely that Avianca's efforts to avail itself of § 304 would have been hotly contested at the beginning of the case, litigation that an airline attempting to reorganize can ill afford.[19]

Thus, there is no basis in this case to deem § 304 a preferred alternative or to find that Avianca was required to file an ancillary rather than a plenary proceeding.

### Section 1112(b)

■ In support of their motions to dismiss, movants also invoked § 1112(b) of the Bankruptcy Code, which provides that a Chapter 11 case may be dismissed or converted to a liquidation under Chapter 7 "for cause, including (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; (3) unreasonable delay by the debtor that is prejudicial to creditors . . . ." Movants argued that Avianca would never be able to effectuate a plan because it could not prevent its Colombian creditors from taking action against its interests or from imposing improper conditions on its reorganization, to the prejudice of creditors in the United States.

There are challenges where any debtor (whether U.S. or foreign) with substantial assets outside of the United States attempts to effect a reorganization without being able to obtain jurisdiction over all or a substantial part of its creditor body. See, *e.g., Brittain v. United States Lines*,

---

18. As noted above, the § 304(c) factors also carry over into the provisions of § 305(a)(2)(B). Under the latter provision, the Court can only dismiss the case under § 305(a)(2) if the foreign proceeding can be recognized under § 304(c).

19. In 1999 Philippine Airlines, which flew aircraft from Manila to the United States, filed an insolvency proceeding in the Philippines and brought a § 304 petition to prevent its principal U.S. creditors from seizing the aircraft or otherwise interfering with its efforts to maintain its routes to the United States. There followed extensive litigation as to whether the Philippine law provided sufficient protection to creditors and whether it should be recognized here. Although the airline was ultimately successful in obtaining injunctive relief, its operations were destabilized and its rehabilitation substantially delayed. See Garfinkle, *Close Enough for Comity: Philippine Rehabilitation Law and Philippine Airline's § 304 Proceeding*, Am. Bankr.Inst. L.Rev., Feb. 18, 1999. See also Tr. 15–16.

*Inc. (In re McLean Indus., Inc.)*, 884 F.2d 1566 (2d Cir.1989). Nevertheless, debtors frequently conclude workouts with their creditors without exerting direct judicial power over their creditors by means of a court filing. A flat rule that a foreign debtor could not maintain a proceeding in this Court without a parallel proceeding abroad would unduly constrict the ability of debtors to reorganize outside of a formal filing, which is usually encouraged. See *Hartigan v. Pine Lake Village Apartment Co. (In re Pine Lake Village Apartment Co.)*, 16 B.R. 750, 752–53 (Bankr. S.D.N.Y.1982). It cannot be presumed that these Debtors, which have had much success to date, cannot achieve a reorganization that is fair to all creditors, including those in the United States, without taking express jurisdiction over their Colombian creditors.

Nor is there any apparent impediment to a filing by Avianca under Law 550 if necessary. If Avianca did file in Colombia, the U.S. case could be coordinated with a case in Colombia in the best interests of all creditors and with due regard to the laws of both nations. See, *e.g., In re Maxwell Communication Corp.*, 93 F.3d 1036 (2d Cir.1996), where joint proceedings were pending in the United States and England; *In re Commodore Int'l, Ltd.*, 262 F.3d 96 (2d Cir.2001), where joint proceedings were pending in the United States and the Bahamas; *Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118 (3d Cir.2002), where parallel proceedings were pending in the United States and Belgium. It is also possible

that some provisions of Colombian law could be consensually applied in a U.S. Chapter 11 case even in the absence of a plenary filing in Colombia. See the opinions of the Bankruptcy and District Courts in *In re Maxwell Communication Corp.*, 170 B.R. 800 (Bankr.S.D.N.Y.1994), and 186 B.R. 807 (S.D.N.Y.1995), *aff'd on other grounds*, 93 F.3d 1036 (2d Cir.1996), where the courts invoked a choice of law analysis (as well as comity) to apply English law in an adversary proceeding commenced in a Chapter 11 case. See also Rasmussen, *A New Approach to Transnational Insolvencies*, 19 Mich. J. Int'l Law 1, 16 (1997). The courts have insisted that § 1112(b) be used with caution in circumstances such as those at bar. See *Bidermann v. RHI Holdings, Inc. (In re Bidermann)*, 1994 WL 376090, 1994 U.S. Dist. LEXIS 9700 (S.D.N.Y. July 18, 1994).[20] On the record of these motions, there is no basis to assume that the Debtors will be unable to effectuate a plan of reorganization.

Finally, we come to the argument that it is unseemly for the United States courts to take sole jurisdiction over the reorganization of an enterprise with its "center of main activities" abroad. This contention raises important issues in connection with the development of principles governing international insolvencies. In an ideal or even in an orderly world, governing law might require a filing in one jurisdiction, presumably the jurisdiction where an international enterprise had its principal place of business or "center of main interests." See *In re Maxwell Communication Corp.*, 93 F.3d at 1053; see

**20.** There the District Court granted the debtor, a French citizen ineligible to file a bankruptcy case in France, a stay pending appeal and suspended the action of the Bankruptcy Court in dismissing the Chapter 11 case pursuant to 11 U.S.C. § 1112(b) on the ground that the action of creditors in France, who were beyond the U.S. court's jurisdiction and were seizing the debtor's property, made it impossible for the U.S. court "to exercise comprehensive jurisdiction over the debtor's assets" and thus there was a "continuing loss to or diminution of the estate" and an "absence of a reasonable likelihood of rehabilitation."

also, Westbrook, *A Global Solution to Multinational Default*, 98 Mich. L.Rev. 2276 (2000); Westbrook, *Multinational Enterprises in General Default*, 76 Am. Bankr.L.J. 1 at 11; Guzman, *International Bankruptcy: In Defense of Universalism*, 98 Mich. L.Rev. 2177, 2206 (2000). In our present world, and on the record of the instant motions, Avianca's Chapter 11 case should be sustained, not dismissed. As was stated in *In re Simon*, 153 F.3d at 999, although courts will generally defer to the "center of gravity" of multiple proceedings if one can be ascertained, a court may also choose to proceed jointly with a foreign court or to "exercise its power to the full extent of its jurisdiction in an appropriate case." This is an appropriate case for the exercise of jurisdiction, and the remaining motions to dismiss are denied.

IT IS SO ORDERED.