### In re GLOBO COMUNICACOES E PARTICIPACOES S.A., Debtor,

GMAM Investment Funds Trust I, Foundation for Research, & WRH Global Securities Pooled Trust, Petitioning Creditors/Appellants,

v.

### Globo Comunicacoes e Participacoes S.A., Appellee.

No. 04 Civ. 2818(VM).

United States District Court, S.D. New York.

Nov. 17, 2004.

Bonnie K. Steingart, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Petitioning Creditors/Appellants.

### DECISION AND ORDER

MARRERO, District Judge.

Appellants GMAM Investment Funds Trust 1, Foundation for Research, and WRH Global Securities Pooled Trust (collectively, "Appellants") have appealed a final order of the United States Bankruptcy Court for the Southern District of New York (Prudence Carter Beatty, U.S.B.J.), pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr.P. 8001(a). That order, dated March 3, 2004, dismissed Appellants' involuntary petition for relief under Chapter 11 of the United States Bankruptcy Code (hereinafter, "the Petition") against Globo Comunicacoes e Participacoes S.A. (hereinafter, "Globopar") for reasons expressed by the Bankruptcy Court in a hearing held on February 19, 2004 (hereinafter, "the Hearing"). Appellants argue that the Bankruptcy Court committed numerous reversible errors in dismissing Appellants' Petition, and request that the order of dismissal be vacated and the case be remanded for further proceedings before a different bankruptcy judge.

For the reasons discussed below, the Court vacates the order of the Bankruptcy Court and remands to the Bankruptcy Court for further proceedings consistent with this opinion. The Court declines to order reassignment of the case to another bankruptcy judge on remand.

### I. BACKGROUND

This appeal presents several novel questions of law concerning a domestic creditor's ability to subject a foreign corporation to the jurisdiction of the federal bankruptcy courts. The involuntary bankruptcy petition giving rise to the appeal represents a creative way of resorting to United States bankruptcy courts to seek repayment of funds owed by an allegedly recalcitrant foreign debtor. The arguments marshaled on behalf of Appellants and Globopar, both in the Bankruptcy Court and on appeal, are similarly novel.

All of the intense lawyering on both sides, however, does not obscure one of the central points in contention in this appeal: that the Bankruptcy Court below did not

develop a factual record sufficient for this Court to properly evaluate many of the arguments presented by Appellants and Globopar on appeal. The Court therefore will order, on remand, that the Bankruptcy Court develop a more detailed factual record, with findings of fact as well as an analysis of procedures necessary to ascertain: whether the case should be dismissed pursuant to 11 U.S.C. § 305(a)(1); whether the Bankruptcy Court may, consistent with Due Process requirements, exert personal jurisdiction over Globopar; and finally, whether the doctrine of *forum non conveniens* should deprive the federal bankruptcy courts of venue over Appellants' petition.

Because of the sparseness of the Bankruptcy Court's record and stated considerations, the following recitation of the facts and allegations contained in the briefs, supporting exhibits, and appellate material submitted to this Court is necessarily incomplete. The Court will nonetheless attempt to provide a brief overview of the facts on which all parties agree, as well as the facts contested by Appellants and Globopar.

## A. *GLOBOPAR'S OPERATIONS AND DEBT*

The parties agree that Globopar is a holding company organized under Brazilian law. Globopar owns, either directly or indirectly, one of the largest television production centers in the world. It is considered the leader in Brazilian pay television services, including among its holdings a major provider of programming content for Brazilian television, a large Brazilian publishing and printing company, and major Brazilian media licensing and distribution operation. Appellants do not dispute that Globopar's headquarters and all of its own employees are located in Brazil, and that its principal office and place of business are in Rio de Janeiro, Brazil. Nor do they dispute that the vast majority of Globopar's property and other holdings are located outside of the United States.

Globopar concedes, however, that it does wholly own a Delaware corporation called DTH USA, Inc. ("DTH"), a holding company that possesses 30 percent interests in each of three Delaware general partnerships. These general partnerships have offices and operations in Florida, but concern pay television subscriber services located exclusively in Latin America. The record does not reveal who else owns interests in the Delaware general partnerships, the value of DTH's partnership interests, or the number of employees employed by, and amount of property owned by, the general partnerships or DTH.[1] Globopar also admits that at one point it had maintained an active bank account in the United States used to distribute interest payments, and that the account shows a current balance of approximately $32,000.[2] It claims that the

---

1. Globopar asserts that DTH "has no employees or operations in the United States" (Brief of Appellee Globo Comunicacoes e Participacoes S.A., dated June 11, 2004 (hereinafter "Appellee Br.") at 11), but the validity of this assertion, given DTH's admitted ownership of interests in three partnerships with operations in the United States, has not yet been put to proof.

2. Appellants have introduced, as Exhibit B to their brief, a JP Morgan bank account statement showing that Globopar held a bank account with JPMorgan Chase Bank, located at 345 Park Avenue in New York City, with investments valued at $30,222 as of December 31, 2003. (Brief of Appellants GMAM Investment Funds Trust I, Foundation for Research and WHR Global Securities Pooled Trust, dated May 11, 2004 (hereinafter, "Appellant Br.") Ex. B). It appears likely that this is the bank account Globopar alleges should no longer exist, but Globopar has not

bank records are inaccurate. However, the validity of this claim was not evaluated by the Bankruptcy Court.

It is also undisputed that Globopar has frequently availed itself of the United States debt market to raise what, by any account, is an extremely large amount of debt. Globopar has direct dollar-denominated debt of approximately $1.18 billion in principal amount. (*See* Appellee Br. at 10.) Though it is unclear from the record before the Court exactly how much of that debt was actually negotiated or sold in the United States, held by United States creditors, or actually paid into United States bank accounts, Appellants allege that the instruments associated with approximately $750 million worth of bond debt (hereinafter, "the Bond Debt" or "the Notes") was sold on United States markets and expressly subjects Globopar to the jurisdiction of New York state or federal courts for "any suit, action or proceedings ... which may arise out of or in connection with the [Bond Debt]." (Appellant Br. at 8–9 (quoting Section 28.01(a) of the Trust Deeds for the Bond Debt containing the jurisdictional provision at issue (hereinafter, "the Trust Deeds")).) Globopar also held a $200 million revolving credit facility entered into with various United States and international banks (hereinafter, "the Bank Debt") that allegedly subjects Globopar to the jurisdiction of New York state or federal courts in "any action or proceeding arising out of or relating to" the Bank Debt. (Appellant Br. at 10 (quoting Section 12.13 of the agreement memorializing the Bank Debt).) Appellants also allege, "on information and belief," that "a substantial portion of the Bank Debt is held by U.S. banks, and a substantial portion of the Bond Debt is owned by U.S. investors" (Appellant Br. at 7), though they have not explained whether the bank's records are erroneous.

proved these claims through any factfinding proceeding.

Also of relevance to this appeal are provisions contained within the Trust Deeds restricting bondholders' ability to sue on the Bond Debt absent approval from 25 percent of the bondholders, commonly known as a "no action" clause. The clause provides in pertinent part that "No Noteholder shall be entitled to proceed directly against the Issuer [*i.e.*, Globopar] ... to enforce the performance of any of the provisions of this Trust Deed, of the Notes," or of related notes unless the trustee of the Bond Debt fails to do so after receiving a written request by the holders of 25 percent or more of the outstanding notes. (*See* Appellant Br. at 41.)

## B. *GLOBOPAR'S DEFAULT ON THE DEBT*

In January of 1999, the Brazilian Central Bank announced that the Brazilian currency unit, the real, would no longer be pegged to the United States dollar. This action caused the value of the real to deteriorate markedly against the dollar, to the point where by October of 2002, the burden on Globopar of dollar-denominated debt negotiated under an earlier Brazilian monetary policy allegedly became untenable. The currency deterioration led Globopar to announce on October 28, 2002, that it would restructure its debt and, to that end, place a moratorium on all interest payments under its debt instruments. It does not appear that those payments have resumed, though Globopar claims to have engaged in consensual restructuring efforts with creditors since it declared the moratorium. According to Globopar, those consensual negotiations have borne fruit, resulting in the formation of steering committees composed of holders of Bank and Bond Debt and progress towards re-

structuring all of the outstanding debt. Globopar claims to have paid over $12 million in fees to advisors to the Bank and Bond Steering Committees in 2003 alone. (*See* Appellee Br. at 11–12.) However, it apparently has not paid any of the accumulated interest on the debt since the October 2002 moratorium, an amount that Appellants estimate totals over $100 million on the Bond Debt alone. (*See* Appellant Br. at 14.)

## C. THE INVOLUNTARY BANKRUPTCY PETITION AND PROCEEDINGS IN THE BANKRUPTCY COURT

Appellants' involuntary bankruptcy petition was filed in the Bankruptcy Court on December 11, 2003. According to Globopar, each of the Appellants is "related in one way or another to an investment company known as W.R. Huff Asset Management Co., Inc." (hereinafter, "Huff"), and the Petition was filed exactly one month after a Huff employee sent a letter demanding that Globopar modify positions it had taken during consensual restructuring discussions. (Appellee Br. at 12–13.) Globopar's allegations clearly imply that Appellants, rather than representing three different creditors' viewpoints, each of whom agreed that filing an involuntary bankruptcy petition was necessary to secure the funds owed to them, actually represented only a single creditor's desire to use the bankruptcy process as a means of extracting concessions from Globopar. The record, however, does not indicate what, if any, corporate or personal ties exist among the three petitioning creditors. Nor does it show whether the petition sought to destroy what would otherwise have been good-faith consensual restructuring negotiations, supported by all other creditors, or whether the negotiations instead were simply interposing unreasonable delay and harming increasingly impatient creditors' interests. The record on this account is incomplete in part because neither the parties, nor the Bankruptcy Court, sought to notify or hear from other creditors of Globopar regarding their views of the voluntary reorganization effort's progress.

Appellants apparently served copies of the Petition on a Mr. Mauro Molchansky and on Debevoise & Plimpton LLP, Globopar's attorney in this matter. (*See* Declaration of Ronnie Vaz Moreira, dated January 19, 2004 (hereinafter, "Moreira Decl.") ¶¶ 30–31.) Globopar responded to the petition by entering a special appearance before the Bankruptcy Court on January 19, 2004, for the purpose of contesting the exercise of jurisdiction over Globopar and seeking to dismiss the Petition. In its Motion to Dismiss, Globopar argued that: (1) the Bankruptcy Court lacked subject matter jurisdiction over the case; (2) the Bankruptcy Court could not assert personal jurisdiction over Globopar because Appellants' service of process was ineffective and because, in any event, the exercise of personal jurisdiction over Globopar would not comport with constitutional Due Process requirements; (3) venue was inappropriate in the Southern District of New York; and (4) the case should be dismissed by the Bankruptcy Court on grounds of *forum non conveniens*. In support of these arguments, Globopar sought to introduce statements from experts on Brazilian law indicating that Brazilian courts would refuse to recognize any orders of the Bankruptcy Court on the grounds that Brazilian courts purported to exercise exclusive jurisdiction over bankruptcy proceedings related to Brazilian companies. (*See* Appellee Br. at 13–14.) Appellants filed response papers on February 10, 2004, to which Globopar replied shortly thereafter.

The Bankruptcy Court held a single hearing on February 19, 2004, to consider Appellants' Petition, and the complex issues raised by Globopar's Motion to Dismiss, at which the court stated several conclusions that served as the basis for its dismissal of Appellants' Petition. As an initial matter, the court concluded that Globopar's consent to the exercise of jurisdiction in New York extended only to suits over the Bond Debt and did not constitute a consent to federal jurisdiction over bankruptcy proceedings such as the ones instituted by Appellants. (*See* Transcript of Hearing on Motion for an Order to Dismiss Petition, Feb. 19, 2004 (hereinafter, "Hr'g Tr.") at 5.) Next, the court explicitly refrained from addressing issues related to service of process. (Hr'g Tr. at 6–7.)

Turning to the merits of Globopar's Motion to Dismiss, the Bankruptcy Court determined *sua sponte* that Appellants' petition constituted an abuse of process, and should therefore be dismissed pursuant to 11 U.S.C. § 105(a).[3] While the court did not clarify the legal principles underlying its conclusions, it listed several reasons why it believed that Appellants' Petition amounted to an abuse of the judicial process. First, the court concluded that it had "never heard of a[sic] involuntary debtor in possession," could not compel Globopar to perform the role of such a debtor (Hr'g Tr. at 8, 30), and thus, did not agree that Appellants were seeking proper relief under the Bankruptcy Code. Second, the court concluded that it could not exercise effective jurisdiction over the case because Globopar had extremely few assets in the United States, and because it credited Globopar's arguments that Brazilian courts would refuse to recognize any judgments or orders issued by the Bankruptcy Court.[4] Brazilian law's apparent hostility towards foreign bankruptcy proceedings involving Brazilian companies was apparently relevant to the court because it concluded that Brazilian courts' lack of cooperation would render it impossible for the Bankruptcy Court to marshal Globopar's Brazilian assets in support of a court-managed restructuring. (Hr'g Tr. at 24–25, 32 (concluding that the court could not "issue any effective order that would bring money from Brazil to the United States").)

Third, though the Bankruptcy Court had earlier stated that it lacked sufficient information to determine whether the "no action" clause in the Trust Deeds limited Appellants' ability to file the instant petition (*see* Hr'g Tr. at 5–6), the court nonetheless concluded that this provision rendered Appellants' filing of a Petition an abuse of the bankruptcy process. This determination was apparently grounded on

---

**3.** 11 U.S.C. § 105(a) states in full: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

**4.** Two essentially uncontroverted declarations submitted by Globopar appear to serve as the Bankruptcy Court's sources for understanding Brazilian bankruptcy law. (*See* Declaration of Sergio Bermudes, dated Jan. 19, 2004 (hereinafter, "Bermudes Decl."), Appellee Br. Ex. D; Declaration of Paulo Cezar Aragão, dated Jan. 16, 2004 (hereinafter, "Aragão Decl."), Appellee Br. Ex. E.) These declarations do appear to support the proposition that Brazilian courts adopt a territorial approach to bankruptcy jurisdiction, and thus would claim exclusive jurisdiction over any bankruptcy matters related to corporations with their main place of business in Brazil. On that basis, it seems likely that a Brazilian court would refuse to recognize any judgments or orders issued by the Bankruptcy Court related to Globopar, which all parties agree is based in Brazil.

the court's view of the Petition as an improper effort to avoid the no action clause and seek to enforce Globopar's obligations without having to gain the support of additional creditors or work through the trustee of the Notes. (*See* Hr'g Tr. at 27–29.)

The alleged presence of these three factors led the Bankruptcy Court to conclude that any further proceedings would waste the court's resources, fail to provide effective relief to creditors, and undermine the provisions of the no action clause. While the court admitted that Appellants' Petition "may not literally fit within the definition of abuse of process" (Hr'g Tr. at 30), it ultimately determined that it had authority under Section 105(a) to dismiss the Petition. (*See* Hr'g Tr. at 29 (quoting Section 105(a)); *id.* at 35–36 ("And, so, I believe it's under the powers that I have under one 105–A [sic] that I can find that there is no purpose that would be served by this proceeding, . . . that it would be an abuse of the bankruptcy process for this case to be allowed to continue.").)

The Bankruptcy Court issued its order dismissing Appellants' Petition on March 5, 2004, "for the reasons stated on the record at the [February 19] Hearing." The instant appeal followed.

## II. *STANDARD OF REVIEW*

■ A bankruptcy court's conclusions of law are reviewed *de novo,* and its findings of fact for clear error. Mixed questions of fact and law are subject to de novo review. *See In re Enron Corp.,* 306 B.R. 33, 37 (S.D.N.Y.2004); Fed. R. Bankr.P. 8013. In this case, the Bankruptcy Court's exercise of equitable powers under

11 U.S.C. § 105(a) is reviewed for abuse of discretion, *see In re McGowan,* 226 B.R. 13, 16 (8th Cir. BAP 1998) ("Normally, a bankruptcy court's exertion of authority under section 105(a) is subject to an abuse of discretion standard of review."), but a bankruptcy court "abuses its discretion if it rests its conclusion on clearly erroneous factual findings or an incorrect legal standard." *Id.* (quoting *In re Cossio,* 163 B.R. 150, 153 (9th Cir. BAP 1994)). A *de novo* standard of review applies to a bankruptcy court's determination regarding the scope of its powers under that statute. *See In re Myrvang,* 232 F.3d 1116, 1124 (9th Cir. 2000) ("The scope of a bankruptcy court's power under § 105(a) is a legal question that we review *de novo.*").

## III. *DISCUSSION*

Appellants and Globopar have presented numerous arguments related to the Bankruptcy Court's order. Most, however, are grounded on unwarranted interpretations of what the Bankruptcy Court actually decided during the Hearing. For instance, Appellants insist that the Bankruptcy Court erroneously decided that Globopar was not subject to personal jurisdiction in New York and that the Bankruptcy Court could assert no subject matter jurisdiction over the case. The Bankruptcy Court explicitly declined to reach these jurisdictional questions, however. Specifically, the court did not address whether Globopar had been properly served, an essential element of the personal jurisdiction analysis. Nor did the court state that it lacked subject matter jurisdiction to hear the Petition.[5] Nonetheless, the court's remarks

---

5. Debtor eligibility under Section 109(a) and federal subject matter jurisdiction are separate considerations. *See, e.g., In re Toronto,* 165 B.R. 746, 756 (Bkrtcy.D.Conn.1994) (holding that a provision of Section 109 "relates to the eligibility of a debtor for . . . relief, not the jurisdiction of the court"). Federal subject matter jurisdiction over the Petition is governed by 28 U.S.C. § 1334(a), which invests federal courts with "original and exclusive jurisdiction of all cases under title 11 [of the United States Code]," and neither the

concerning these issues indicated that it may have held erroneous views of the governing law. For example, the court indicated that it lacked power to reach Globopar's property in Brazil, even if it could assert personal jurisdiction over the company, and held that it could not force Globopar to be an involuntary debtor-in-possession even if the Petition otherwise met the requirements of the Bankruptcy Code. (Hr'g Tr. at 30.) In both of these instances, the court's view was not grounded on correct legal principles.

Nor did the Bankruptcy Court hold, as Globopar contends in its brief, that the Petition should be dismissed on *forum non conveniens* grounds, or that, as a matter of law, a bankruptcy court must obtain general personal jurisdiction over the subject of an involuntary bankruptcy petition for its exercise of that jurisdiction to be constitutional. The court never mentioned the doctrine of *forum non conveniens* during the course of the hearing or in its concluding analysis, nor did it examine all of the many factors involved in applying that doctrine, in reaching its conclusion.[6] The Bankruptcy Court also did not attempt to apply the law governing the assertion of personal jurisdiction over foreign defendants, though it did state that it had no power to marshal Globopar's assets due to Brazilian law, contrary to Appellants' argument that the court could take jurisdiction over Globopar's property if the company is subject to personal jurisdiction in the United States.

Rather than speculate on what the Bankruptcy Court may have decided, this Court will evaluate what that court actually *did* decide: that Appellants' petition

should be dismissed pursuant to 11 U.S.C. § 105(a), which empowers bankruptcy courts to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. (*See* Hr'g Tr. at 29, 35–36.) That statute explicitly authorizes a bankruptcy court to "*sua sponte,* tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *Id.*

The Bankruptcy Court necessarily ruled on interpretations of the jurisdictional consent and no action clauses contained in the Trust Deeds, as well as on Globopar's eligibility to serve as an involuntary debtor in possession under 11 U.S.C. §§ 109 & 303, and on the power of federal courts to compel Globopar to turn over its foreign assets to the Bankruptcy Court, as part of its abuse of process analysis. The Bankruptcy Court explicitly stated at the beginning of the Hearing that the jurisdictional consent clauses "do not constitute a consent of jurisdiction in the [bankruptcy] court," but instead only allow actions on the notes governed by the clauses. (Hr'g Tr. at 5.) The court also necessarily ruled that the no action clause prohibited Appellants from filing the Petition on their own when it stated that "I am saying that you have no right to sue on your claim. That is included in the claim in the bankruptcy cases." (Hr'g Tr. at 28.) The Bankruptcy Court also concluded that Globopar was not an eligible debtor under Section 109 of the Bankruptcy Code because it determined that Globopar lacked sufficient assets in the United States. (Hr'g Tr. at 21–

parties nor the Bankruptcy Court has alleged that the Petition was not properly brought pursuant to that provision.

**6.** The transcript of the Hearing contains two passages in which Globopar appears to have

raised *forum non conveniens* as grounds for dismissal, but the Bankruptcy Court did not respond to that invitation. (*See* Hr'g Tr. at 19–20.)

22, 35.) Finally, the Bankruptcy Court concluded that any orders it issued regarding Globopar's foreign assets would not be enforceable, as it clearly held that "it cannot issue any effective order that would bring money from Brazil to the United States." (Hr'g Tr. at 32; *see also id.* at 35.)

The Court determines that each of these actual rulings by the Bankruptcy Court was either erroneous or premature, and therefore remands for reconsideration by the Bankruptcy Court. The Court also recommends further specific action to be taken by the Bankruptcy Court in order to facilitate proper and efficient disposition of the case.

## A. *SECTION 105(a)*

 Section 105(a) of the Bankruptcy Code is not intended to provide bankruptcy courts with unfettered discretion to dismiss cases that are merely difficult to adjudicate or that may ultimately fail to provide full relief to creditors. The "abuse of process" provision of that statute has never been applied by a bankruptcy court to allow dismissal of a claim where the Petition appears, at least facially, to state a good-faith claim for relief under the Bankruptcy Code, and where a parallel provision of the Code, in this case, 11 U.S.C. § 305(a)(1), discussed in greater detail below, as well as alternative established doctrines governing challenges to personal jurisdiction and assertions of *forum non conveniens*, would prescribe different procedures and different standards for dismissal of the Petition.[7]

The abuse of process provision of Section 105(a) has instead been employed to impose sanctions upon those who willfully mislead the bankruptcy court, *see In re Gorshtein,* 285 B.R. 118 (Bankr.S.D.N.Y. 2002); who file clearly frivolous petitions in order to interpose delays upon creditors, *see In re Collins,* 250 B.R. 645 (Bankr.N.D.Ill.2000); *In re Head,* 223 B.R. 648 (Bankr.W.D.N.Y.1998); or who fail to comply with court orders concerning scheduling or other matters, *see In re Freeman,* 224 B.R. 376 (Bankr.S.D.Ohio 1998). While such sanctions may include dismissal of a case, *see id.,* the intended purpose of Section 105(a)'s abuse of process provision would not be served here, where Appellants' Petition is not patently fraudulent, dilatory or duplicative, where there is no indication that the relief sought is clearly prohibited by the Bankruptcy Code, and where other provisions of the Code and other acknowledged doctrines anticipate and provide more particular guidelines for adjudicating issues that the Bankruptcy Court improperly considered under Section 105(a). The Bankruptcy Court itself acknowledged that it may have been acting outside of its powers under Section 105(a) when it stated during the Hearing that the Petition "may not literally fit within the definition of abuse of process." (Hr'g Tr. at 30.) Thus, the Bankruptcy Court's construction of its powers under Section 105(a) was incorrect as a matter of law.[8]

While Appellants' Petition may have seemed to the Bankruptcy Court to be

---

7. 11 U.S.C. § 305(a)(1) authorizes a bankruptcy court to dismiss or suspend a petition when "the interests of creditors and the debtor would be better served by such dismissal or suspension."

8. Because the Bankruptcy Court's interpretation of its powers under Section 105(a) presented a legal question, the Court has applied

the *de novo* standard of review to this issue, rather than the more permissive abuse of discretion standard of review urged on the Court by Globopar. In any event, the Bankruptcy Court abused its discretion by relying on an erroneous view of the validity of Appellants' Petition when applying Section 105(a).

facially invalid and filed for improper purposes, any such conclusions were based on a misreading of both the relevant law concerning Appellants' authority to file the Petition and the Bankruptcy Court's ability to exercise control over Globopar's property and consider Globopar an eligible debtor under the Bankruptcy Code. The Bankruptcy Court's errors of law are discussed below.

### 1. The No Action Clause

■ The Bankruptcy Court inappropriately concluded during the Hearing that, as a matter of law, the no action clause affirmatively barred Appellants from filing the instant Petition. As discussed above, the no action clause contained within the Trust Deeds states: "No Noteholder shall be entitled to proceed directly against the Issuer [*i.e.*, Globopar] ... to enforce the performance of any of the provisions of this Trust Deed, of the Notes," or of related Notes unless the trustee of the Bond Debt fails to do so after receiving a written request by the holders of 25 percent or more of the outstanding Notes. (Appellant Br. at 41.) Appellants argue that, by its own terms, the no action clause prohibits only independent suits to enforce the performance of the Notes themselves, and does not purport to restrict Appellants' ability to file an involuntary bankruptcy petition pursuant to 11 U.S.C. § 303 based on Globopar's failure to pay claims due to them.

■ While the Bankruptcy Court clearly read the no action clause more broadly than Appellants to prohibit Appellants from filing bankruptcy petitions as well as actions to enforce the Trust Deed or the Notes, this interpretation was improper as a matter of law where, as here, the provisions of the no action clause are at least ambiguous and where Appellants alleged that the clause should not be interpreted to preclude the Petition. Pursuant to the jurisdictional provisions of the Trust Deeds, upwards of 80 percent of the Notes, including those Notes held by Appellants, are governed by New York law. Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir.2004) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002)). While it may be appropriate for a court to definitively construe a contractual provision under New York law when that provision is "complete, clear and unambiguous on its face," when a contract provision is ambiguous, "[u]nless for some reason [that] ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings." *Id.* Under New York law, ambiguity exists "where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir.2003)).

In this case, the no action clause does not on its face purport to prohibit Appellants from filing an involuntary bankruptcy petition without the consent of the trustee of the Notes. Particularly when compared with the jurisdictional submission clause of the Trust Deeds, which according to Appellants, subject Globopar to New York jurisdiction for "any suit, action or proceedings ... which may arise out of or in connection with" the Bond Debt, the no

action clause appears narrowly tailored to limit Appellants' ability to sue directly on the debt. While the parties may well have intended the no action clause to be construed broadly in order to limit Appellants ability to bring any action "arising out of or relating to" Globopar's obligations to it, such language is not contained in the clause itself, and therefore the clause is at best ambiguous. Since this Court can find no reason why this ambiguity should have been construed automatically against Appellants, the Court reverses the Bankruptcy Court's interpretation of the clause, determines that on its face the no action clause could not cause Appellants' filing of the Petition to constitute an abuse of process, and remands for the Bankruptcy Court's construction of the clause according to the relevant legal standards.

### 2. *Globopar's Eligibility to Serve as an Involuntary Debtor–in–Possession*

█ The Bankruptcy Court also determined, without holding any evidentiary proceedings, that Globopar could not qualify as an involuntary debtor-in-possession. First, the court concluded that, even if Globopar was proven to own a bank account with $32,000 in holdings and a Delaware corporation, DTH, that could be worth several million dollars, Globopar was not eligible under Section 109 of the Bankruptcy Code to serve as a debtor. This conclusion is based on a misreading of the Code. Section 109 authorizes any person or corporation that "resides or has a domicile, a place of business, or property in the United States" to be a debtor under the Bankruptcy Code. 11 U.S.C. § 109(a). While Globopar may not be considered to reside or have a domicile within the United States, and while DTH may not be considered a "place of business" within the United States, Globopar's ownership of DTH and the bank account would, if substantiated through sufficient factfinding proce-

dures, clearly establish Globopar's eligibility to serve as a debtor under Section 109. For a foreign corporation to qualify as a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is "virtually no formal barrier" to having federal courts adjudicate foreign debtors' bankruptcy proceedings. *In re Aerovias Nacionales de Colombia S.A. (In re Aviance)*, 303 B.R. 1, 9 (Bkrtcy.S.D.N.Y.2003) (quoting 2 L. King, *Collier on Bankruptcy*, ¶ 109.02[3] (15th ed. rev.2003)); *see also Maxwell Communication Corp. plc v. Societe Generale plc (In re Maxwell Communication Corp.)*, 186 B.R. 807, 818–19 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2d Cir.1996).

█ Second, though Appellants' efforts to cause Globopar's adjudication as an involuntary debtor-in-possession may be novel, involuntary debtor-in-possession status is clearly authorized under the Bankruptcy Code. Section 303 specifically permits Appellants to file an involuntary petition under Chapter 11 of the Bankruptcy Code, *see* 11 U.S.C. § 303(b), and Sections 1101(1) and 1107(a) of the Bankruptcy Code state that a debtor will presumptively act as debtor-in-possession, with all of the rights, powers, and duties of a trustee, unless a trustee is appointed to administer the bankruptcy estate. Furthermore, although conceivably, further evidentiary proceedings may establish otherwise, Appellants appear to have complied with the other requirements imposed by Section 303 for their Petition to be considered valid: their claims against Globopar are brought by three entities, are valued at well above $11,625, the statutory minimum, and are not "contingent as to liability or the subject of a bona fide dispute," 11 U.S.C. § 303(b)(1), and Globopar is allegedly "generally not paying [its] debts as such debts become due," *id.*

§ 303(h)(1). Thus, there appears to be no reason why Globopar could not be considered an eligible debtor, and thus no cause to consider the filing of a Petition against Globopar an abuse of the judicial process.

### 3. The Bankruptcy Court's Power over Globopar's Property

Finally, the Bankruptcy Court concluded that even if properly before it, the Petition amounted to an abuse of process because the court could under no circumstances grant effective relief to Globopar's creditors. The court reached this conclusion without engaging in any sustained analysis regarding its ability to subject Globopar to personal jurisdiction in matters related to the Petition, and without evaluating whether it could in fact grant effective, if not perfect, relief to creditors notwithstanding the apparent hostility of Brazilian law to foreign bankruptcy proceedings concerning Brazilian companies.

Assuming for purposes of argument that the Bankruptcy Court had concluded, after sufficient factfinding procedures, that it could assert personal jurisdiction over Globopar consistent with Due Process requirements, and should not apply other recognized abstention doctrines grounded on comity or public policy, there is no reason why the court could not issue an order asserting control over all of Globopar's assets, wherever located.[9] The Bankruptcy Court is empowered to do so by 28 U.S.C. § 1334(e), which states: "The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate," and by Section 541 of the Bankruptcy Code, which enumerates categories of property, "wherever located and by whomever held," comprising a bankruptcy estate. 11 U.S.C. § 541(a).[10]

■ Congress intended these jurisdictional provisions to have global reach. *See Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir.1998), *cert. denied*, 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999) ("Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate"); *In re Gucci*, 309 B.R. at 683 (declaring that "Section 1334(e) ... embodies a Congressional determination that bankruptcy courts should determine rights in property of bankrupt

---

9. As discussed in greater detail *infra*, the Bankruptcy Court may not be able to secure compliance with such orders except to the degree that it may either assert personal jurisdiction over those now in possession of Globopar's assets or obtain cooperation from courts in foreign jurisdictions where Globopar's assets are located. Furthermore, a foreign court might hypothetically issue conflicting orders concerning Globopar pursuant to the foreign court's own view of its jurisdiction over the company and its assets, should creditors not subject to personal jurisdiction in the United States move for such orders. *See, e.g., In re Gucci*, 309 B.R. 679, 683–84 (S.D.N.Y. 2004). The following discussion is not intended to discourage cooperation among jurisdictions in insolvency proceedings, or deferral to foreign proceedings in a proper case. But there is no indication in the record before this Court that Globopar is not itself fully in possession of its assets, that any substantial Globopar creditors would not be subject to personal jurisdiction in the United States, should the need arise for the Bankruptcy Court to compel compliance by such creditors with the court's orders, or that any potentially conflicting foreign bankruptcy proceedings are pending.

10. The Bankruptcy Court was granted this jurisdiction over the estate of Globopar pursuant to 28 U.S.C. § 157(a), which authorizes district courts to refer all cases arising under the Bankruptcy Code to bankruptcy courts, and the Standing Order of Referral of Cases to Bankruptcy Judges, Southern District of New York, dated July 10, 1984.

estates regardless of where that property may be found"); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y.1996) (enforcing automatic stay against foreign receiver related to foreign assets of foreign debtor).

 Such exercise of extraterritorial jurisdiction over a debtor's assets, even absent the consent of that debtor, is consistent with constitutional Due Process standards where the bankruptcy court has established its authority to assert *in personam* jurisdiction over the debtor and thereby take control over the worldwide *res* of the debtor's estate. Congress intended bankruptcy courts, under the supervision of the federal district courts, to exercise the full extent of *in personam* and *in rem* jurisdiction over the debtor and its bankruptcy estate in order to facilitate efficient and effective distribution of those assets. The House Report accompanying the predecessor statute to the current 28 U.S.C. § 1334 states that the intent of the statute was to ensure that "[t]he bankruptcy court is given *in personam* jurisdiction as well as *in rem* jurisdiction to handle everything that arises in a bankruptcy case." H.R.Rep. No. 95–595 at 445 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6400; *see also In re Schack Glass Industries Co., Inc.*, 20 B.R. 967, 970 (Bankr.S.D.N.Y. 1982) (concluding that Congress created "a statutory rule designed to reflect that the totality of *in personam* and *in rem* jurisdiction should be exercised by the bankruptcy courts in order to avoid fragmentation of litigation and in furtherance of the spirit of economy in administration of bankruptcy estates").[11]

 If a bankruptcy court were unable to exert *in personam* jurisdiction over a debtor, its power over that debtor's assets would be limited. A court, in exercising its *in rem* jurisdiction alone, is constitutionally empowered to adjudicate rights to property only when such property is legally or physically located within its own jurisdiction. *See* 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1070 (3d ed. rev.2004) ("One of the requirements of *in rem* or *quasi-in-rem* jurisdiction is that the property be within the court's jurisdiction at the time of suit."). In exercising its authority *in personam*, however, a court may assert extraterritorial jurisdiction over the person of the defendant, and affect rights to the defendant's property located outside of the court's jurisdiction, if the exercise of that jurisdiction otherwise complies with statutory and Due Process requirements. *See Burnham v. Superior Court*, 495 U.S. 604, 618, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) (noting that, at least since *International Shoe Co. v. Washington*, 326 U.S.

---

**11.** While the law that H.R.Rep. No. 95–595 accompanied and that *In re Schack* cited, The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598 (1978), was ultimately found by the Supreme Court to increase the bankruptcy courts' power impermissibly vis-a-vis Article III district courts, *see Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), that holding did not affect federal courts' ability to exercise both *in personam* jurisdiction over litigants in bankruptcy proceedings and *in rem* jurisdiction over the *res* of the bankruptcy estate. The broad jurisdictional language of the current 28 U.S.C.

§ 1334 and Fed. R. Bankr.P. 7004(f) (concluding that "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule *or* [with Fed.R.Civ.P. 4] . . . is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the [Bankruptcy] Code . . . ."), as well as post-*Northern Pipeline* courts' willingness to exercise jurisdiction over a debtor's foreign assets and over foreign litigants subject to the existence of personal jurisdiction in the United States, make this proposition clear.

310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), a "defendant's litigation-related 'minimum contacts' may take the place of physical presence as the basis for [*in personam*] jurisdiction"); *Shaffer v. Heitner*, 433 U.S. 186, 210, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (noting the extraterritorial reach of a judgment *in personam*); *In re Simon*, 153 F.3d at 991 (concluding that a foreign creditor subject to personal jurisdiction in federal bankruptcy court could be compelled to comply with orders concerning foreign property).

Consistent with these principles, 11 U.S.C. § 303, the statute authorizing involuntary bankruptcy petitions, enables a bankruptcy court to exercise control over and distribute the worldwide assets of a debtor, against that debtor's will, by first asserting *in personam* jurisdiction over the debtor. In stating that "[a]n involuntary case *against a person* is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title," and authorizing a bankruptcy court to "order relief *against the debtor* in an involuntary case," 11 U.S.C. §§ 303(b) & (h) (emphasis added), the Bankruptcy Code makes clear that a bankruptcy court exercises power pursuant to Section 303 *in personam* against the debtor as well as *in rem* with respect to the debtor's estate, "wherever located and by whomever held." 11 U.S.C. § 541(a).

This Court thus does not agree with a legal conclusion reached in a decision, otherwise well reasoned, recently issued by another bankruptcy court in this District and involving matters similar to the one now before this Court. *See In re Board of Directors of Multicanal S.A.*, 314 B.R. 486, 522 (Bkrtcy.S.D.N.Y.2004). In that case, the bankruptcy court ruled that an invol-

untary petition filed by several entities, apparently affiliated with Appellants, against an Argentinian corporation for failure to pay dollar-denominated debt sold on United States markets should be dismissed. The court concluded that it was required to abstain from hearing the involuntary petition, in part because of "the objective futility of the maintenance of a [foreign corporation's] reorganization in the United States, over the opposition of the putative debtor. Bankruptcy jurisdiction has traditionally been premised on the existence of a *res* and the *in rem* jurisdiction of the court in administering the estate." *Id.* (citing *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, ——, 124 S.Ct. 1905, 1910, 158 L.Ed.2d 764 (2004)).

The *Multicanal* court's analysis inverts the proper consideration of a bankruptcy court faced with an uncooperative foreign debtor by focusing on the current location of the debtor's assets rather than the nature and extent of the debtor's contacts with the United States. While *Hood* did conclude that a distribution of a debtor's assets under the Bankruptcy Code constituted a form of *in rem* proceeding, it explicitly noted that the bankruptcy court's jurisdiction was premised on jurisdiction over the *debtor* as well as the debtor's estate, and concluded further that a reorganization could be effective even if the Bankruptcy Court could not assert personal jurisdiction over, or obtain cooperation from, all creditors. *See Hood*, 541 U.S. at ——, 124 S.Ct. at 1910 ("A bankruptcy court is able to provide the debtor a fresh start in this manner, despite the lack of participation of all of his creditors, because the court's jurisdiction is premised on the *debtor and his estate*, and not on the creditors.") (emphasis added).[12]

12. *Hood* represented an example of a situation in which jurisdiction over the debtor and

the *res* of her bankruptcy estate was necessary for the court to effectuate the goals of the

■ Conceivably, the Bankruptcy Court in this case may not be able to assert *in personam* jurisdiction over all substantial creditors of Globopar or prevent a Brazilian court from issuing rulings inconsistent with its judgments. Nevertheless, a bankruptcy court, "[l]ike all federal courts, ... ha[s] a 'virtually unflagging obligation ... to exercise the jurisdiction given' it." *In re Gucci*, 309 B.R. at 683 (quoting *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Use of this jurisdictional power may be necessary to vindicate the rights of Globopar's domestic creditors, provided that Due Process, comity, and public policy considerations would permit its exercise.[13] Globopar's cooperation would be desirable, but it is not mandated; otherwise, the Bankruptcy Code would contain no provision for *involuntary* bankruptcy petitions.

To be sure, such an exercise of jurisdiction may have drastic effects on Globopar's business and operations, and, as discussed below, arguably would not be consistent with comity considerations or Due Process absent significant evidence that Globopar purposefully availed itself of the United States forum, and could therefore reasonably anticipate being haled into bankruptcy court. Furthermore, potential lack of cooperation from Globopar, foreign creditors, and Brazilian courts would certainly stand as a significant impediment to the orderly administration of Globopar's bankruptcy estate, since there is no indication that the Bankruptcy Court would be able to obtain the cooperation of foreign creditors who are not subject to the Bankruptcy Court's jurisdiction and whom a Brazilian court may not compel to participate in any United States bankruptcy proceedings. *See In re Avianca*, 303 B.R. at 14 ("Consent is often a critical factor in determining the proper scope of a bankruptcy court's jurisdiction."); Lynn L. LoPucki, *Cooperation in International*

Bankruptcy Code, but jurisdiction over all creditors was not. In *Hood*, a state agency refused to submit to the jurisdiction of the bankruptcy court in an adversary proceeding seeking discharge of the debtor's student loan debt, alleging that the proceeding could not be maintained against it on sovereign immunity grounds. The Supreme Court held that the adversary proceeding did not offend the state's sovereign immunity because the bankruptcy court never sought to assert jurisdiction over the state agency, and did not need to do so in order to determine whether the debt owed to the state should be discharged. *See id.* at 1914 ("the Bankruptcy Court's *in rem* jurisdiction allows it to adjudicate the debtor's discharge claim without *in personam* jurisdiction over the State"). Thus, *Hood* holds that a bankruptcy court may, in the exercise of its *in rem* jurisdiction over the estate, adjudicate rights to the *res* of a debtor's estate notwithstanding a creditor's refusal to submit itself to the bankruptcy court's jurisdiction.

13. Comity considerations have not yet formally arisen in this case, where there do not appear to be any foreign bankruptcy proceedings pending, and thus no factual record and cognizable basis to conclude that the "center of gravity" of insolvency proceedings must be located in Brazil rather than in the United States. *See In re Simon*, 153 F.3d at 999 (noting that, where multiple bankruptcy proceedings are pending in various fora, a bankruptcy court ought to defer to the jurisdiction where the "center of gravity" of proceedings exists, but concluding that "[i]nternational comity" does not prohibit a bankruptcy court from issuing binding orders concerning foreign property and litigants where "there is no conflicting proceeding in a foreign nation at issue"). If a Brazilian insolvency proceeding were pending, however, comity concerns would clearly come into play under Section 305(a)(2) of the Bankruptcy Code (authorizing dismissal on comity grounds where "there is pending a foreign [insolvency] proceeding") and under federal bankruptcy law's flexible approach to international insolvencies. *See In re Simon*, 153 F.3d at 998.

*Bankruptcies: A Post–Universalist Approach,* 84 Cornell L.Rev. 696 (1999) (discussing the need for legal regimes concerning multinational insolvencies that facilitate cooperation among jurisdictions). Such considerations may well weigh heavily in the Bankruptcy Court's assessment of factors enumerated by Section 305(a)(1) of the Bankruptcy Code, or by other jurisdictional and equitable doctrines.

These considerations, however, should not by themselves prevent a federal court from exercising the full measure of authority granted to it by the Constitution and by Congress to enforce federal bankruptcy law. One of Congress's objectives in adopting the involuntary petition provision of the Bankruptcy Code, 11 U.S.C. § 303, was to provide a means by which United States creditors could have their claims to the assets of a debtor vindicated in a timely and fair manner. It would unduly frustrate this objective if a federal bankruptcy court automatically deferred even to a hypothetical prospect that foreign courts may assert exclusive jurisdiction over bankruptcy matters, no matter how much debt the prospective bankrupt raised in the United States and owed to United States creditors, and no matter how extensive the foreign entity's other contacts in the United States. A bankruptcy court must balance comity, Due Process, and other policy considerations with these Congressional objectives when determining whether a petition such as the one filed by Appellants should be dismissed, essentially on discretionary abstention grounds.

In this case, if the Bankruptcy Court, upon full analysis of the record and appropriate further proceedings, concluded that Globopar is properly subject to personal jurisdiction in the Bankruptcy Court by reason of its voluntary decision to seek approximately $1 billion of debt in United States markets from United States creditors and then fail to pay that debt as it became due, then Globopar should be prepared to face potential reasonable foreseeable consequences flowing from that decision. Those consequences may include the requirement that the company comply with the Bankruptcy Court's orders concerning aggregation and distribution of its property pursuant to rules established by federal law.[14] Consequently, the Bankruptcy Court improperly concluded that its exercise of jurisdiction over Globopar would be futile, and thus an abuse of the bankruptcy process.

## B. CONSIDERATIONS ON REMAND

While the Bankruptcy Court improperly dismissed the Petition pursuant to Section 105, it may, on remand, choose to consider whether, upon proper notice and opportunity for a hearing, the Petition should be dismissed pursuant to Section 305(a)(1). Based on the materials currently before the Court, this Petition appears to represent a strong candidate for abstention under that section of the Bankruptcy Code, but the Bankruptcy Court must make efforts to ascertain whether the best interests of Globopar and other creditors would

---

14. This Court declines to consider whether Globopar would fail to comply with any hypothetical order issued pursuant to the Bankruptcy Court's power under 28 U.S.C. § 1334(e) and Sections 303 and 541 of the Bankruptcy Code, or whether contempt or other sanctions that might be levied upon Globopar would fail to elicit compliance from the corporation. Suffice it to note that such noncompliance is likely to adversely affect Globopar's ability to procure investment within the United States, and have even more lasting effects on its reputation among holders of debt. Such self-destructive recalcitrance should not be assumed.

actually be served by dismissal of the Petition. Alternatively, should the Bankruptcy Court conclude that dismissal under Section 305(a)(1) is not warranted under the circumstances, it may hold an evidentiary hearing concerning whether, consistent with the considerations discussed above, the court may properly assert personal jurisdiction over Globopar, or whether the doctrine of *forum non conveniens* applies to these proceedings to justify dismissal of the Petition on that independent basis.

### 1. *Section 305(a)(1)*

Section 305(a)(1) of the Bankruptcy Code provides that a court, "after notice and a hearing," may dismiss or suspend all proceedings in a case at any time if "the interests of creditors and the debtor would be better served by such dismissal or suspension." Courts that have construed Section 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under that provision only where the court finds that both "creditors and the debtor" would be "better served" by a dismissal. *See, e.g., In re RAI Marketing Services, Inc.*, 20 B.R. 943, 945–46 (Bankr.D.Kan. 1982); *In re Martin–Trigona*, 35 B.R. 596, 598–99 (Bankr.S.D.N.Y.1983); *In re Pine Lake Village Apartment Co.*, 16 B.R. 750, 753 (Bankr.S.D.N.Y.1982). This test requires that both creditors and debtors benefit from the dismissal, rather than applying a simple balancing test to determine whether dismissal is appropriate. *See In re Eastman*, 188 B.R. 621, 624–25 (9th Cir. BAP 1995).

The statutory language and legislative history also demonstrate that Congress intended not to allow dissident creditors to use involuntary bankruptcy as a weapon against other creditors and the debtor when the debtor is seeking to pursue a voluntary reorganization with the cooperation of the vast majority of creditors. The legislative history of Section 305(a)(1) uses the following example of such a situation:

> an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 325 (1977); *reprinted in* 1978 U.S.C.C.A.N. 5963, 6281. Some courts have developed a three-part test to ascertain whether an involuntary petition such as the one before this Court should be dismissed pursuant to Section 305(a)(1), authorizing dismissal if: (1) the petition was filed by a few disgruntled creditors and most creditors oppose the bankruptcy proceeding; (2) there is an out-of-court restructuring in progress; and (3) the debtor's and creditors' interests are furthered by dismissal. *See, e.g., In re Grigoli*, 151 B.R. 314, 319–20 (Bankr.E.D.N.Y. 1993).

Based on the current information before this Court, application of this test to the facts of this case would very likely result in a dismissal pursuant to Section 305(a)(1). It appears that Appellants are the only creditors, representing a significant but still minority fraction of Globopar's debt, who are seeking to force Globopar into bankruptcy court; Globopar is actively pursuing an out-of-court restructuring; and Globopar's interests would very likely be furthered by dismissal, which would enable it to avoid the risk of inconsistent judgments emanating from the United States and Brazil, and of noncompliant foreign creditors unwilling to re-

structure their debt pursuant to a United States court's order. Most creditors' interests would also be furthered by dismissal if an out-of-court restructuring treats all creditors fairly and avoids the time and expense associated with bankruptcy litigation.

■ However, the Bankruptcy Court cannot know whether a majority of creditors oppose Appellants' Petition until those creditors are actually notified and have an opportunity to express their views. Appellants assert that the Bankruptcy Court cannot initiate such a proceeding *sua sponte*, but the Court disagrees. Courts may raise abstention issues sua sponte. *See Catlin v. Ambach*, 820 F.2d 588, 591 (2d Cir.1987) ("this Court may raise the abstention issue *sua sponte*") (citing *Bellotti v. Baird*, 428 U.S. 132, 143 n. 10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)). Furthermore, Section 105(a) provides the Bankruptcy Court with power to act *sua sponte* to order notice and any hearing required by Section 305(a)(1). The power of the Bankruptcy Court to issue such orders *sua sponte* was made clear when Congress amended Section 105(a) in order to eliminate an earlier requirement that such orders issued pursuant to the Section be made by "a request of a party in interest." See *Minkes v. LaBarge (In re Minkes)*, 237 B.R. 476, 478 n. 2 (8th Cir. BAP 1999) (noting the amendment of Section 105(a) to permit actions to be taken by the Bankruptcy Court pursuant to Section 105(a) *sua sponte*).

■ While the Bankruptcy Court must make reasonable efforts to ensure that all substantial creditors are notified of any planned dismissal pursuant to Section 305(a)(1), which requires any ruling on that provision to be "after notice and a hearing," the court is not required at this stage of the proceedings to provide personal notice to all Globopar creditors.

Section 102 of the Bankruptcy Code grants considerable discretion to bankruptcy courts to determine what would meet the "notice and a hearing" requirements of Section 305(a)(1). *See* 11 U.S.C. § 102(1)(A) ("after notice and a hearing, or a similar phrase ... means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances"). In this connection, Fed. R. Bankr.P.2002(a)(4) requires that notice be given to all "parties in interest" by mail prior to a hearing on a dismissal of a case. However, Rule 2002(1) authorizes notice by publication "if [the court] finds that notice by mail is impracticable." Thus, the Bankruptcy Court may determine on remand, for example, that personal notice need only be given to major creditors already identified through the Bank and Bond Steering Committees, and that notice by publication to other creditors may be sufficient under the particular circumstances of this case. In this instance, the court's considerations may take into account that no creditors other than Appellants have been formally identified and brought into this action, and that notice by publication would avoid the time-consuming and potentially wasteful process of requiring Globopar to develop and provide the court with a list of all creditors, wherever located, notify those creditors, and await their responses, if any, to the proposed abstention.

■ In any event, it does not appear that Section 305(a)(1) abstention, absent full notice, would implicate Due Process considerations, since no *res* would be distributed without the opportunity for full creditor participation, and since any creditors not notified of the motion to dismiss could not be precluded from bringing a subsequent involuntary petition against

Globopar.[15] Thus, no creditors other than Appellants would have their interests permanently affected by a Section 305(a)(1) dismissal without personal notice. However, the Bankruptcy Court would abuse its discretion were it to dismiss the Petition pursuant to Section 305(a)(1) without undertaking reasonable efforts to ascertain the "interests of creditors" with respect to the Petition.

### 2. *Personal Jurisdiction*

■ The Court will not examine the issue of personal jurisdiction in any great detail, except to provide an appropriate legal standard for the Bankruptcy Court to consider upon remand, should such consideration be necessary. "The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996).

■ The Court concludes first that the "minimum contacts" inquiry should be evaluated under the rubric of specific jurisdiction, rather than under the general jurisdiction framework urged upon the Court by Globopar. This consideration follows because the Petition clearly "arises out of" Globopar's conduct in the forum, *i.e.*, its raising of debt in the United States that it has now allegedly failed to pay. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (applying the "mini-

mum contacts" test associated with specific jurisdiction "[w]hen a controversy is related to or arises out of a defendant's contacts with the forum") (internal quotation marks omitted).

■ Under the second component of the personal jurisdiction Due Process analysis, a court must examine whether the exercise of personal jurisdiction over the defendant "is reasonable under the circumstances of the particular case." *Metropolitan Life*, 84 F.3d at 568. Under this standard, "the determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors. A court must consider the burden on the defendant, the interests of the forum [jurisdiction], and the plaintiff's interest in obtaining relief." *Asahi Metal Industry Co., Ltd. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In addition, where, as here, the involuntary participant in the action is foreign, a court must consider:

> the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction.... [T]hose interests, as well as the Federal Government's interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by mini-

---

**15.** While Appellants may be bound by any order of dismissal issued by the Bankruptcy Court, other Globopar creditors would not. "Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are ... bound by a judgment or decree." *Martin v. Wilks*, 490 U.S. 755, 765, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). Notice and opportunity to intervene may be sufficient to bind nonparties to a judicial distribution of a *res* resulting from a bankruptcy proceeding, *see id.* at

762 n. 2, 109 S.Ct. 2180 (noting that "where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process"); *Hood*, 541 U.S. at ——–——, 124 S.Ct. at 1911–13, but if the Bankruptcy Court dismisses the case there will be no distribution of a *res*, and thus no determination of relative rights to the *res*, that could conceivably bind other Globopar creditors.

mal interests on the part of the plaintiff or the forum [jurisdiction].

*Id.* at 115, 107 S.Ct. 1026. According to applicable Supreme Court guidance: "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Id.* (quoting *United States v. First National City Bank*, 379 U.S. 378, 404, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting)).

Application of the specific jurisdictional analysis, and the accompanying Due Process fairness test, in the context of this case would require further factfinding proceedings to determine, as an initial matter, the meaning and scope of Globopar's contractual consents to jurisdiction, which allegedly subject Globopar to the jurisdiction of New York state or federal courts in "any action or proceeding arising out of or relating to" the Bank Debt, and contain similar language in the Trust Deeds associated with the Bond Debt. (Appellant Br. at 10.) The Bankruptcy Court must construe this provision pursuant to New York law, as discussed above, regarding contract interpretation methodology. The Bankruptcy Court may also choose to evaluate the degree to which Globopar purposefully availed itself of the United States as a forum to raise capital from domestic banks and financiers, and whether this purposeful availment is sufficiently extensive that Globopar should reasonably anticipate that it might be held to account, and have all of

its assets reorganized, in a United States bankruptcy court. *Id.*[16]

### 3. *Forum Non Conveniens*

■ Finally, the Bankruptcy Court may evaluate Globopar's motion for dismissal on the basis of *forum non conveniens* to determine whether it should decline to hear the case under that doctrine. With Globopar's burden of proof in mind, and taking into account doctrine that counsels deference to plaintiff's choice of forum in appropriate circumstances, *see Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir.2001) (en banc); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F.Supp.2d 198, 206–207 (S.D.N.Y. 2002), the Bankruptcy Court must weigh the private and public interest factors articulated by *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), as being relevant to the determination of whether *forum non conveniens* dismissal is appropriate:

> Private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) issues concerning the enforceability of a judgment; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive—or the opposite. Public interest factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in

**16.** In undertaking this analysis, the Bankruptcy Court may wish to consider how the extent of Globopar's activities within or directed at the United States, the policies articulated by Brazilian bankruptcy law, and the unique nature of an involuntary bankruptcy action might distinguish the reasonableness considerations in this case from those in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). In that case, the Supreme Court summarily concluded that the assertion of personal jurisdiction over Argentina was proper because, "by issuing negotiable debt instruments denominated in United States dollars and payable in New York and by appointing a financial agent in that city, Argentina purposefully availed itself of the privilege of conducting activities within the United States." *Id.* at 619–20, 112 S.Ct. 2160 (internal quotation marks and brackets omitted).

having controversies decided at home; (3) the interest in having a trial in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *United Feature Syndicate,* 216 F.Supp.2d at 207. Should the Bankruptcy Court determine that *forum non conveniens* considerations may warrant dismissal of the Petition, it should apply the relevant factors in the first instance.

## C. REASSIGNMENT

■ Finally, the Court must consider Appellants' argument that the case should be reassigned to another judge upon remand. The principal factors to be weighed in making a determination of whether reassignment is appropriate are:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously– expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Mackler Productions, Inc. v. Cohen,* 225 F.3d 136, 147 (2d Cir.2000) (quoting *United States v. Robin,* 553 F.2d 8, 10 (2d Cir.1977)) (en banc).

■ This Court concludes, on application of the factors listed above, that reassignment is unnecessary at this time. As *Robin* counsels, most matters are "properly left to the [lower] court" on remand. *Robin,* 553 F.2d at 9. This result follows even though cases are usually remanded because the decisions under review contained at least some element of error. While this Court has found several reversible errors in the Bankruptcy Court's oral opinion rendered below, such errors are not to be wholly unexpected when litigants such as Appellants employ novel legal arguments and litigation strategies in support of their interests. Appellants have not demonstrated why they believe that the Bankruptcy Court's "previously-expressed views" of the law are so strongly felt that it could not put those views aside when properly instructed on remand. Nor have Appellants indicated why "the appearance of justice" would be undermined by remanding the case to Judge Beatty, since there is no evidence on the record before the Court that the decision below was based on personal animus, or any other improper factor, for that matter, other than an erroneous view of a manifestly murky, scant, and thus unsettled body of law. Finally, while reassignment would not entail significant waste and duplication of effort, as the Bankruptcy Court has only given limited consideration to the Petition thus far, this factor should not lead by itself to a determination that the case ought to be reassigned. Therefore, this Court denies Appellants' motion to reassign the case to a new bankruptcy judge on remand.

## IV. CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that the order of the Bankruptcy Court dated March 3, 2004, dismissing the involuntary bankruptcy petition filed by Appellants GMAM Investment Funds Trust I, Foundation for Research, and WRH Global Securities Pooled Trust against Globo Comunicacoes e Participacoes S.A., is vacated and remanded for proceedings not inconsistent with this opinion.

The Clerk of Court is directed to close this case.

**SO ORDERED.**